MAINE SUPREME JUDICIAL COURT
Decision: 2013 ME 76
Docket: Han-13-10
Argued: June 11, 2013
Decided: August 20, 2013

Reporter of Decisions

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

# SINCLAIR BUILDERS, INC.

v.

# UNEMPLOYMENT INSURANCE COMMISSION

JABAR, J.

[¶1] Sinclair Builders, Inc., appeals from a judgment entered in the Superior Court (Hancock County, *Cuddy, J.*) pursuant to 5 M.R.S. § 11007(4) (2012) and M.R. Civ. P. 80C affirming the Unemployment Insurance Commission's decision that twenty-four individuals were employees of Sinclair as defined in 26 M.R.S. § 1043(11)(E) (2010).[1]  Sinclair argues that the Commission erred in determining that pursuant to 26 M.R.S. § 1043(11)(E)(1) and (2), Sinclair failed to rebut the presumption that the individuals at issue were employed with Sinclair.  We affirm the judgment in part, and vacate in part.

---

[1] The Legislature substantially amended the definition of employment in 2011, *see infra* n.3, but because the amended statute contains no language to indicate that the Legislature intended it to operate retroactively, and this case was pending as of July 8, 2010, we apply the version of the statute that was in force in 2010.  *See* 1 M.R.S. § 302 (2012); *cf. Bernier v. Data Gen. Corp.*, 2002 ME 2, ¶¶ 15-17, 787 A.2d 144.

## I. BACKGROUND

[¶2]   Sinclair Builders, Inc., is a general construction company located in Ellsworth.   In 2010, the Maine Department of Labor Bureau of Unemployment Compensation conducted a random audit of Sinclair's business to verify the relationship between Sinclair and a list of twenty-four individuals that Sinclair had claimed were independent contractors.   *See* 26 M.R.S. § 1082(1) (2012) (providing that the Commissioner of Labor, through the Bureau, "may . . . make investigations and take other actions" necessary to administer the Employment Security Law).   On July 8, 2010, the Bureau determined that all twenty-four individuals were employees of Sinclair as defined in 26 M.R.S. § 1043(11)(E).   Thus, the Bureau assessed Sinclair unpaid unemployment tax liability for each of those individuals, from 2007 through the first quarter of 2010, at $16,630.55, with an additional $6,053.17 in interest and penalties.   Sinclair appealed the Bureau's determination to the Commission, *see* 26 M.R.S. § 1082(14)(D) (2012), which made the following findings.

[¶3]   Sinclair is in the business of residential construction and renovation, and between 2007 and early 2010, the company employed some individuals who

were undisputedly employees and who were not listed in the Bureau's decision.[2] The Bureau's list of workers whose status was disputed contained three categories of individuals: two salesmen, a bookkeeper, and twenty-one skilled subcontractors who performed various construction tasks.

[¶4] The two salesmen and Sinclair's president would locate construction and renovation projects in the greater Ellsworth area. When the salesmen found a project, they would offer to sell the customer retail products including windows, doors, fixtures, and other items related to Sinclair's construction or renovation business. Sinclair controlled the terms of the sales and paid the salesmen by fixed commissions, and the salesmen could not negotiate the commission rate. The salesmen occasionally worked from Sinclair's office, but they typically worked from various locations in a defined territory around Ellsworth.

[¶5] Sinclair also hired a part-time bookkeeper who worked from Sinclair's office three days per week. The bookkeeper provided general office support—answering telephones, taking messages, and communicating with clients. The bookkeeper billed Sinclair weekly for her work and was covered by Sinclair's liability insurance. Sinclair had the right to instruct or discharge the bookkeeper.

---

[2] Sinclair's president testified that he hired between six and eight ordinary employees during the relevant time for whom he paid unemployment insurance taxes and whom he hired to perform the same general construction tasks as some of the skilled subcontractors.

4

[¶6]  Sinclair acted as the general contractor for customers and hired workers to perform general carpentry services and specific services, such as plumbing, heating, and electrical work, that Sinclair's ordinary employees could not perform. Sinclair paid these workers the standard market rate for their services.

[¶7]  Sinclair did not provide training or equipment to the workers that it hired, but it did instruct the individuals to follow the specifications on Sinclair's contract with the customer.  The workers provided their own separate liability insurance.  Sinclair also required that all of the individuals who worked on its projects follow safety protocols, regardless of whether it considered them independent contractors or employees.

[¶8]  The Commission held a hearing on December 15, 2010, and on August 10, 2011, it affirmed the Bureau's determination as to the bookkeeper, the salesmen, and nineteen of the subcontractors.  The Commission vacated the Bureau's decision as to two of the remaining subcontractors, for whom it found there was no evidence in the record to support a finding of employment by Sinclair.  Sinclair sought review of the Commission's determination in the Superior Court, *see* 26 M.R.S. § 1082(14)(D); *see also* 5 M.R.S. § 11001(1) (2012), which affirmed the Commission's judgment in a memorandum of decision on December 5, 2012.  Sinclair filed this timely appeal.  *See* 5 M.R.S. § 11008 (2012); M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶9]   "When, as in this case, the Superior Court sits as an intermediate appellate court and reviews an agency decision, we review the administrative tribunal's decision directly."  *Vector Mktg. Corp. v. Me. Unemployment Ins. Comm'n*, 610 A.2d 272, 274 (Me. 1992).  We review the Commission's judgment "to determin[e] whether the Commission correctly applied the law and whether its fact findings are supported by any competent evidence [in the record]." *McPherson Timberlands, Inc. v. Unemployment Ins. Comm'n*, 1998 ME 177, ¶ 6, 714 A.2d 818.  "We will not overrule findings of fact supported by substantial evidence, defined as 'such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion.'"  *Lewiston Daily Sun v. Unemployment Ins. Comm'n*, 1999 ME 90, ¶ 7, 733 A.2d 344 (quoting *Crocker v. Me. Emp't Sec. Comm'n*, 450 A.2d 469, 471 (Me. 1982)).

[¶10]   With respect to the law, we review de novo issues of statutory interpretation.  *Carrier v. Sec'y of State*, 2012 ME 142, ¶ 12, 60 A.3d 1241.  However, "we defer to an agency in those areas within its expertise unless a statute or regulation compels a contrary result."  *Schwartz v. Unemployment Ins. Comm'n*, 2006 ME 41, ¶ 9, 895 A.2d 965 (quotation marks omitted).  "We first look to the plain meaning of the statute, interpreting its language to avoid absurd, illogical or inconsistent results."  *Carrier*, 2012 ME 142, ¶ 12, 60 A.3d 1241 (quotation marks

6

omitted). "[A] misapplication of the law to the facts will constitute reversible error, and if an agency fails to make adequate findings of fact, the Court may remand for findings that would permit meaningful judicial review." *Nancy W. Bayley, Inc. v. Me. Emp't Sec. Comm'n*, 472 A.2d 1374, 1377 (Me. 1984) (citations omitted).

[¶11]  At the relevant time, the Employment Security Law, which governs unemployment compensation, defined "employment" as including "any . . . service in interstate commerce, performed for wages." 26 M.R.S. § 1043(11). The statute defined "wages" broadly to include "all remuneration for personal services, including commissions, bonuses[,] . . . and the cash value of all remuneration in any medium other than cash." 26 M.R.S. § 1043(19) (2010). It is undisputed that Sinclair provided wages in exchange for personal services pursuant to section 1043.

[¶12]  If the Bureau established that the employer paid wages in exchange for an individual's services, there was a presumption of an employment relationship between that employer and the individual. *See* 26 M.R.S. § 1043(11)(E). The employing company could rebut the presumption, however, by demonstrating that the employment relationship met three requirements listed in

26 M.R.S. § 1043(11)(E)(1) to (3), generally referred to as the ABC test.[3] These requirements were

> **([A])** Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact;
>
> **([B])** Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> **([C])** Such individual is customarily engaged in an independently established trade, occupation, profession or business.

26 M.R.S. § 1043(11)(E)(1) to (3). The burden of proof is on the employer to establish all three of these criteria; "[t]o satisfy one or two, and not all three, leaves the relationship for purposes of the Act one of 'employment.'" *Hasco Mfg. Co. v. Me. Emp't Sec. Comm'n*, 158 Me. 413, 415, 185 A.2d 442 (1962). The Commission correctly determined that Sinclair met its burden of showing that all of the individuals on the Bureau's list met criterion C—having been customarily

---

[3] In 2011, the Legislature amended 26 M.R.S. § 1043(11)(E) (2010) to completely redefine the test for "employment." *See* P.L. 2011, ch. 643, § 6 (effective Dec. 31, 2012) (codified at 26 M.R.S. § 1043(11)(E) (2012)). When the Legislature was considering amending the test, the Acting Commissioner of the Department of Labor testified that the amended definition addressed complaints of unfairness and frustration from the business community concerning the broad and uncertain nature of the ABC test. Testimony of Laura L. Boyett, Acting Comm'r, Me. Dep't of Labor on L.D. 1420 & L.D. 1314 (125th Legis. 2011) before the Joint Standing Committee on Labor, Commerce, Research & Econ. Dev. (May 4, 2011). Further, the Bureau, in its report to the joint legislative committee considering the amended definition, stated that "[a]lthough containing only three elements, the 'ABC' test was broadly written and difficult for employers and workers to use effectively as guidance without the assistance of 'experts' in the application of the test." The Dep't of Labor, Bureau of Unemployment Compensation, Report to the Joint Standing Comm. on Labor, Commerce, Research & Economic Development of the 125th Legislature 2 (Feb. 2012).

8

engaged in an independently established trade. Thus, we address only parts A and B.

[¶13]  With respect to part A, which requires the employer to demonstrate that an individual is free from the employer's direction and control over the performance of that individual's services "both under his contract of service and in fact," *see* 26 M.R.S. § 1043(11)(E)(1), we have noted, "Control contemplated by the statute is general control and the right to control may be sufficient even though it is not exercised." *Me. Auto Test Equip. Co. v. Me. Unemployment Comp. Comm'n*, 679 A.2d 79, 81 (Me. 1996) (quotation marks omitted). One commentator has observed that consideration of the "right to control" means that "[t]he possibility of control in the future would thus seem to be as decisive as present control." Benjamin S. Asia, *Employment Relation: Common-Law Concept and Legislative Definition*, 55 Yale L.J. 76, 87 (1945).

[¶14]  With respect to part B of the ABC test, the employer must demonstrate that the individual provides a service that is "outside the usual course of the business" of the employer or "outside of all the places of business of the enterprise for which such service is performed." 26 M.R.S. § 1043(11)(E)(2). This prong is disjunctive, meaning that the employer needs to show only one of the two alternatives. *See McPherson Timberlands, Inc.*, 1998 ME 177, ¶ 7, 714 A.2d 818.

[¶15] In order to demonstrate that an individual's services are not within the employer's usual course of business, the employer must show that the service is not an "integral part of" the employer's business, but is rather "merely incidental to" it. *See id.* ¶¶ 9-15 (quotation marks omitted). For example, we have held that the repair and maintenance of real estate properties were incidental to the usual course of business of a bank, *see Me. Unemployment Ins. Comm'n v. Me. Sav. Bank*, 136 Me. 136, 140-41, 3 A.2d 897 (1939), but those same services were an integral part of the business of a property owner and landlord, *see Me. Unemployment Comp. Comm'n v. Androscoggin Jr., Inc.*, 137 Me. 154, 164, 16 A.2d 252 (1940).

[¶16] Alternatively, the employer could demonstrate that the individual's "service is performed outside of all the places of business of the enterprise" in order to satisfy part B. *See* 26 M.R.S. § 1043(11)(E)(2). An employer's place of business may include a place where the employer "has a significant and business-related presence." *See McPherson Timberlands, Inc.*, 1998 ME 177, ¶ 17, 714 A.2d 818. In *McPherson Timberlands, Inc.*, we upheld a finding by the Commission that a timber harvesting company that employed a person to perform tree removal had a significant, business-related presence in the woodlot where those services were performed, and it was therefore a place of business of that employer. *Id.* ¶¶ 17-18.

[¶17]  Moreover, we are mindful that the rapid progress in technology and the changing demands of the workplace may require a flexible interpretation of this part of the test.  As the Vermont Supreme Court recently observed in applying that state's identical statute, "The demands of parenthood, communications-technology advances, issues of energy consumption, and other circumstances have created a new type of employee—one who works from her home or car, enjoying flexibility in the time and place of performance."  *Fleece on Earth v. Dep't of Emp't & Training*, 923 A.2d 594, 600 (Vt. 2007).  Defining an employment relationship solely based on the individual's presence in or absence from the employer's place of business may be more difficult given the nature of today's workers.

A.    Bookkeeper

[¶18]  The Commission determined that Sinclair failed to satisfy both parts A and B of the ABC test with respect to the bookkeeper.  Sinclair does not dispute that its office, where the bookkeeper performed her services, is the company's place of business.  *See* 26 M.R.S. § 1043(11)(E)(2).  Instead, Sinclair contends that the bookkeeper was free from Sinclair's direction and control over the performance of her services, and that the bookkeeping services were outside Sinclair's usual course of business.  *See id.* § 1043(11)(E)(1)-(2).

[¶19]  With respect to its course of business, Sinclair argues that "[t]he fact that balancing a company's books and paying its bills is necessary to continue

operating does not transform a construction contracting business into a bookkeeping or accounting firm." However, the law does not require an employee's service to transform the company into a provider of that service. *Cf. McPherson Timberlands, Inc.*, 1998 ME 177, ¶¶ 9-15, 714 A.2d 818. Rather, part B of the ABC test requires the employer to demonstrate that an individual provides a service that is not an "integral part" of the company's business, but is "merely incidental" to it. *Id.* ¶¶ 9-10 (quotation marks omitted); *Androscoggin Jr., Inc.*, 137 Me. at 164, 16 A.2d 252 (concluding that repair and maintenance of buildings were within the usual course of a landlord's business). There is substantial evidence in the record supporting the Commission's finding that the bookkeeper's services—answering phones, taking messages, and handling the company's billing and payments—were an integral part of Sinclair's business. *See Gerber Dental Ctr. Corp. v. Me. Unemployment Ins. Comm'n*, 531 A.2d 1262, 1264 (Me. 1987) (holding that dentists' services were within the course of the company's business as a "full range" dental service provider). Therefore, we conclude that the Commission did not err with respect to part B of the test, and we affirm its decision as to the bookkeeper. Because we will affirm the Commission's decision regarding an employee if the employer failed to satisfy any one prong of the ABC test, we do not need to reach the issue of whether the bookkeeper was

12

free from Sinclair's direction or control. *See Hasco Mfg. Co.*, 158 Me. at 415, 185 A.2d 442.

B.    Salesmen

[¶20]  The Commission similarly determined that Sinclair failed to meet its burden for both prongs A and B with respect to its two salesmen.  Sinclair argues that the Commission's finding that the salesmen were not free from the company's direction and control is not supported by the evidence in the record because Sinclair provided only certain leads and did not instruct them on how to make sales.  Further, Sinclair argues that the salesmen were not located in Sinclair's place of business for the purpose of part B.

[¶21]  In *Hasco Manufacturing Company*, we addressed whether salespeople were free from the direction or control of a company that was in the business of fabricating and selling aluminum products "in the form of windows, doors, storm sash[es], combination windows and garages."  158 Me. at 416, 185 A.2d 442. Despite the absence of a written contract between Hasco and its salespeople, we affirmed findings that the salespeople received a commission from the sales that they made of Hasco products, and that Hasco set the terms of all sales and ultimately accepted or rejected all transactions initiated by its salespeople.  *Id.* at 416-17.  We concluded that, based on these factual findings, the court was correct

in concluding that the salespeople were not free from Hasco's direction or control over the performance of their services. *Id.* at 418.

[¶22] Similarly, the evidence in the record supports the Commission's findings that Sinclair had the right to control the performance of the salesmen's services. Sinclair dictated the terms of their sales, provided a set commission, without negotiation from either salesman, and gave the salesmen business cards bearing Sinclair's name and logo. *See id.* at 416-18. Additionally, Sinclair's president testified that he would ultimately choose which sales to make, taking the most potentially lucrative clients. *See id.* Therefore, we conclude that the Commission did not err in determining that Sinclair failed to meet its burden of demonstrating that the salesmen were free from its direction and control. *See* 26 M.R.S. § 1043(11)(E)(1); *Hasco Mfg. Co.*, 158 Me. at 416-18, 185 A.2d 442. Having concluded that the Commission did not err with respect to part A of the ABC test, we decline to address whether the salesmen acted within the usual course or regular place of Sinclair's business pursuant to part B. *See Hasco Mfg. Co.*, 158 Me. at 415, 185 A.2d 442.

C.    Skilled Workers

[¶23] Finally, the Commission again found that Sinclair failed to meet its burden of satisfying both parts A and B of the ABC test with respect to the skilled workers that it employed as subcontractors. *See* 26 M.R.S. § 1043(11)(E)(1)-(2).

14

We note at the outset that the Commission vacated the Bureau's determination with respect to two workers for whom it found that there was no evidence to support a finding of an employment relationship. Further, at oral argument, Sinclair conceded an employment relationship with a groundskeeper who provided services around Sinclair's office. We affirm the Commission's decision as to these three individuals and go on to address the remaining eighteen workers.[4]

1. Part A: Control or Direction

[¶24] The Commission found that Sinclair failed to meet its burden of showing that the workers were "free from control or direction over the performance of such services, both under [their] contract[s] of service and in fact." *See* 26 M.R.S. § 1043(11)(E)(1). Although the Commission found that Sinclair "controlled the price and form of [its] contract[s] with clients," it did not make any findings with respect to the *workers'* contracts of service. The evidence in the record compels us to conclude that the workers were free from Sinclair's direction and control with respect to their contractual relationship. *Cf. Me. Auto Test Equip.*

---

[4] To clarify, we note that our opinion pertains to the following eighteen skilled workers listed in the Bureau's determination: Dennis Donnell, Eddie Ellis, Frank Zimmerman, Jeffrey Long, Joel Reisman, Joseph Paganucci, Kevin Cobb, Les Mushero, Mark Rowly, Michael Becker Jr., Nathan B. Boyington, Noah Jordan, Paul Bean Jr., Ricky N. Sinclair Sr., Robert Card, Robert Latchaw, Rusty Poors, and Sonney (Bert) Sinclair.

Although the Commission's decision listed all of the disputed workers by their initials, with the exception of two—Joseph Paganucci and Frank Zimmerman—it stated that its decision applied to "all other individuals not listed in this opinion." Because the evidence in the record is similar for Joseph Paganucci, Frank Zimmerman, and the other workers for which the Commission found an employment relationship, we discuss them together.

*Co.*, 679 A.2d at 80-81. In *Maine Auto Test Equipment Company*, we affirmed the Commission's finding that an employer exercised direction and control over the performance of its salespeople's services where it restricted its salespeople from competing with the company after their employment, assigned them to specific geographic regions, reserved the right to give final approval to all sales, and provided sales leads to its employees. *Id.*

[¶25] In contrast, Sinclair's president testified that none of the workers worked exclusively for Sinclair during the years covered by the Bureau's audit. Sinclair hired them on a job-by-job basis and they often worked for competing contractors in the area providing the same services. The workers would occasionally turn down an offer to work with Sinclair if they were unavailable for that job, and Sinclair's president testified that the company would need to turn to "[its] employee base or somebody else" to complete its projects. In addition, Sinclair required the workers to provide their own insurance.

[¶26] For most of the skilled workers, Sinclair provided the Bureau with copies of certifications that it had obtained from the Workers' Compensation Board stating that those individuals were predetermined and presumed to be independent contractors for workers' compensation purposes. *See* 39-A M.R.S. §§ 105(1), 105-A(1)(B) (2010). Sinclair also filed an Internal Revenue Service Form 1099 reporting nonemployee compensation for each worker to whom it made

payments in the years covered by the Bureau's audit. *See* I.R.C. § 3121(d) (2006); I.R.C. § 3402 (Supp. 2011); Treas Reg. § 31.3121, Q&A (d)-1 & (d)-2 (as amended in 1980). Further, Sinclair's president testified that the workers would occasionally bring employees or assistants with them to a job, and Sinclair was not involved in those arrangements. These facts demonstrate the lack of direction or control that exists in a contractual relationship between a business and an independent contractor. *Cf. Contract Mgmt. Servs., Inc. v. La. Dep't of Labor*, 745 So.2d 194, 199 (La. Ct. App. 1999) (applying part A of the ABC test and vacating an agency determination that relied on facts that were "not indicia of control or direction over the performance of the services that [the individual] was providing under the contract" (emphasis omitted)).

[¶27] Despite the evidence outlined above, the Commission found that Sinclair failed to demonstrate that the workers were free from Sinclair's "control or direction over the performance of [their] services . . . *in fact.*" *See* 26 M.R.S. § 1043(11)(E)(1) (emphasis added). We conclude that the Commission's determination is erroneous and not supported by the evidence in the record for three reasons.

[¶28] First, the Commission's conclusion was based, in part, on a finding that Sinclair "mandated the safety measures required for all job sites and communicated that if [its] safety guidelines or training was not adhered to,

termination was possible." However, the Commission's finding with regard to safety measures is not relevant to the finding of an employment relationship. *Cf. Allied Res. for Corr. Health v. Me. Unemployment Ins. Comm'n*, 680 A.2d 456, 458 (Me. 1996) (affirming the Commission's determination that employees were subject to the employer's direction or control where they were required to follow detailed policies of the employer and its clients). Sinclair's president testified that he holds safety meetings and enforces safety measures for every worker because he believed that Sinclair was required to do so pursuant to the Occupational Safety and Health Administration regulations. *See* 29 U.S.C.A. § 654(a) (West 2012); 29 C.F.R. § 1926.21(b)(2) (2012) (requiring the employer to provide "instruct[ion] . . . in the recognition and avoidance of unsafe conditions" to every employee, meaning "every laborer . . . regardless of the contractual relationship which may be alleged to exist between the laborer . . . and the contractor . . . who engaged him," 29 C.F.R. § 1926.32(j)-(k) (2012)).

[¶29] If a business is required by law to comply with state or federal regulations, we do not require that business to face penalties for violating those regulations or to endanger the health or safety of its workers in order to avoid being characterized as an employer for unemployment insurance purposes. *See* 29 C.F.R. § 1903.15 (2012) (providing that penalties may be imposed for violations of applicable safety standards). Sinclair's control over the safety of its

workers is very different from the type of detailed oversight that we cited in support of a finding of an employer's direction or control in *Allied Resources for Correctional Health*, where the employer required employees to "submit to *all rules, regulations and policies* of [the employer] and its clients." *See* 680 A.2d at 458 (emphasis added).

[¶30] Second, although the Commission found that Sinclair was responsible for "fixing the problem" if the customer was not satisfied with the workers' performance, the evidence in the record compels the opposite finding—that the workers bore the burden of "fixing the problem" if the customer was not satisfied. In the responses to the Bureau's two-page questionnaires regarding the employment relationship with the disputed workers, to the question "Who pays for work the worker performs that must be done over?" the box next to "[t]he worker," was marked, rather than the boxes next to "[t]he company," "[t]he customer," or "[o]ther." Further, there is no evidence in the record that Sinclair bore the financial burden of redoing the work. For many services, such as heating, plumbing, electrical, or roofing, Sinclair did not have employees who could perform the same tasks. Sinclair could not have been responsible for "fixing the problem[s]" related to those services as the Commission found. Thus, the evidence in the record does not support the Commission's finding. *See Lewiston Daily Sun*, 1999 ME 90, ¶ 7, 733 A.2d 344; *Hasco Mfg. Co.*, 158 Me. at 414, 185 A.2d 442.

[¶31]  Third, with respect to Sinclair's direction of the workers, the Commission's finding that Sinclair "controlled the nature and scope of the workers' work" is not supported by the evidence in the record.  *See* 26 M.R.S. § 1043(11)(E)(1).  Although a finding that the employer controlled the *manner* in which services are performed weighs in favor of a determination that the individual was not free from the employer's direction and control*, see Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 593 A.2d 1177, 1185 (N.J. 1991), the "control" exercised by Sinclair at these projects is not the type of control that determines an employer-employee relationship.

[¶32]  We agree with the reasoning of the First Division of the Indiana Appellate Court in *Alumiwall Corporation v. Indiana Employment Security Board*, explaining why roofers and siding installers were independent contractors:

> the [workers] were free to perform the services when and in such manner as they saw fit.  They provided their own tools and equipment, and could, if they so desired, hire helpers and determine the wage scale of such helpers.  The only restriction was that they perform such services in a good and workmanlike manner.  Such restriction is inherent in all services performed by one for another.  To hold that such a restriction is the retention of direction and control over such service so as to exclude it from [part] (A) is against good reasoning and common sense.

167 N.E.2d 60, 62 (Ind. Ct. App. 1960); *see also N. Am. Builders, Inc. v. Unemployment Comp. Div., Dep't of Emp. Sec.*, 453 P.2d 142, 145 (Utah 1969).

[¶33]  Here, Sinclair's president testified that he would visit the jobsites "once or twice, depending on the length of it," unless the project was the construction of an entire home, in which case he would visit "once a week." Sinclair did not employ a foreman or on-site boss who supervised how services were performed.  *Cf. Steel Pier Amusement Co. v. Unemployment Comp. Comm'n*, 127 N.J.L. 154, 157 (N.J. 1941) (finding that an employer failed to establish that the employees were free of its direction or control where it also employed someone who "was for all practical purposes, a foreman").  Instead, Sinclair created a list of the customer's specifications and provided a copy to each of the workers. Although the Commission based its determination that the workers were not free of Sinclair's control in part on its finding that Sinclair instructed the workers "to follow specifications in the contract, which explained the project in detail," the contract to which the Commission refers was negotiated between Sinclair *and the customer*, outlining the customer's preferences.  Insofar as Sinclair acted as an intermediary, communicating the customer's specifications to each of the workers, it did not exert direction and control over the performance of the skilled workers' services.  *Cf. Carpet Remnant Warehouse, Inc.*, 593 A.2d at 1189 ("Specific factors indicative of control include whether the worker is required to work any set hours or jobs, whether the enterprise has the right to control the details and means by which the services are performed, and whether the services must be rendered

personally."). The evidence in the record that is relevant to a finding of control or direction over the "performance of such services . . . in fact" is the testimony of Sinclair's president that, after providing the worker with a copy of the customer's specifications, the company did not give the workers any further instruction.

[¶34] There is no competent evidence in the record to support the Commission's finding that Sinclair exercised control or direction over the disputed workers. *See Lewiston Daily Sun*, 1999 ME 90, ¶ 7, 733 A.2d 344. Rather, all of the evidence in the record demonstrates that Sinclair met its burden with regard to part A of the ABC test. *C.f. Me. Auto Test Equip. Co.*, 679 A.2d at 81.

2. Part B: Place of Employment

[¶35] Sinclair stipulates that the workers' services were within Sinclair's usual course of business but disputes that they were performed within Sinclair's places of business. Sinclair argues that the construction jobsites were not "places of business" pursuant to part B of the test.

[¶36] Although we have held that a woodlot constitutes a place of business for a timber harvester, where the employer has a "significant and business-related presence," *see McPherson Timberlands, Inc.*, 1998 ME 177, ¶¶ 17-18, 714 A.2d 818, we have declined to call customers' homes a place of business for salespeople, despite the fact that they made sales there, *see Hasco Mfg. Co.*, 158 Me. at 418, 185 A.2d 442.

[¶37]   Several other states have declined to call a construction jobsite a "place of business" within the meaning of part B of the ABC test because it "precludes any construction company from ever meeting the requirements of [the ABC test] with regard to tradespeople hired for construction work." *See Metro Renovation, Inc. v. State Dep't of Labor*, 543 N.W.2d 715, 722 (Neb. 1996), *disapproved on other grounds by State v. Nelson*, 739 N.W.2d 199, 204 (Neb. 2007).   *See also Matter of BKU Enters., Inc.*, 513 N.W.2d 382, 385 (N.D. 1994) ("The fact that the contract must be performed at a specific location, such as a building site, does not, by itself, constitute furnishing a place to work if the nature of the work to be done precludes a separate site or is the customary practice in the industry." (quotation marks omitted)); *Barney v. Dep't of Emp't Sec.*, 681 P.2d 1273, 1275 (Utah 1984).

[¶38]   The Commission's determination that a construction jobsite is a place of business within the meaning of 26 M.R.S. § 1043(11)(E)(2) could require a general contractor to be responsible for unemployment insurance taxes for a delivery person who provides the materials from a lumber company, for example. If this were the test, an employer's "satisf[action of] the B standard's second alternative would be practically impossible." *See Carpet Remnant Warehouse, Inc.*, 593 A.2d at 1190; *see also* Christopher J. Cotnoir, Comment, *Employees or Independent Contractors: A Call for Revision of Maine's Unemployment*

*Compensation "ABC Test,"* 46 Me. L. Rev. 325, 338-39 (1994) (discussing the economic effects of the restrictive ABC test on the construction industry).

[¶39]  Such an illogical reading of part B is not consistent with the intent of the Legislature.  *See Carrier*, 2012 ME 142, ¶ 12, 60 A.3d 1241 (stating that we interpret statutes to avoid illogical results).

> [W]e cannot permit the letter of the law to transcend the spirit of the law. . . . [W]hether a person performing services is an employee or an independent contractor is the question before us, and statutes [applicable to] . . . such determinations must not be distorted to allow persons who are truly independent in their operation to be held employees merely for tax purposes and resulting benefits derived from an employer-employee relationship.

*Johnson v. Mont. Dep't of Labor & Indus.*, 783 P.2d 1355, 1357-58 (Mont. 1989) (quotation marks omitted).  Thus, we do not defer to the Commission's determination with respect to part B and conclude that Sinclair has met its burden. *See* 26 M.R.S. § 1043(11)(E)(2).

[¶40]  Because the Commission erred in determining that Sinclair failed to meet its burden with respect to parts A and B of the ABC test with respect to eighteen of the disputed workers, we vacate the Commission's judgment with regard to those individuals.  Having concluded that Sinclair met its burden of demonstrating that those eighteen workers met all three criteria of the ABC test, we remand the case for a redetermination of the appropriate taxes and penalties consistent with this opinion.

24

The entry is:

> Judgment vacated as to the eighteen individuals identified in footnote 4 of this opinion, and affirmed in all other respects. Remanded to the Superior Court for remand to the Unemployment Insurance Commission for further proceedings consistent with this opinion.

---

**On the briefs:**

Frank T. McGuire, Esq., and John K. Hamer, Esq., Rudman Winchell, Bangor, for appellant Sinclair Builders, Inc.

Janet T. Mills, Attorney General, and Elizabeth J. Wyman, Assist. Atty. Gen., Office of Attorney General, Augusta, for appellee Maine Unemployment Insurance Commission

**At oral argument:**

John K. Hamer, Esq., for appellant Sinclair Builders, Inc.

Elizabeth J. Wyman, Asst. Atty. Gen., for appellee Maine Unemployment Insurance Commission