MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2014 ME 52
Docket:      BCD-13-121
Argued:      February 11, 2014
Decided:     April 3, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

## MALLINCKRODT US LLC et al.

v.

## DEPARTMENT OF ENVIRONMENTAL PROTECTION

MEAD, J.

[¶1] Mallinckrodt US LLC and United States Surgical Corporation[1] (collectively, "Mallinckrodt") appeal from a judgment entered in the Business and Consumer Docket (*Nivison, J.*) affirming a decision of the Board of Environmental Protection, which modified and affirmed a compliance order issued by the Commissioner of the Department of Environmental Protection. The Commissioner's order required Mallinckrodt to excavate material containing mercury and other contaminants from five landfills located on a site adjacent to the Penobscot River in Orrington, and to transfer the material to off-site landfills. The Board's decision modified the Commissioner's order, requiring that Mallinckrodt excavate only two of the landfills and that it secure and monitor the others. We affirm the judgment.

---

[1] Mallinckrodt US LLC is a wholly-owned subsidiary of United States Surgical Corporation.

## I.  BACKGROUND

[¶2]  Mallinckrodt is the only viable remaining entity to take responsibility for the site of the former HoltraChem chemical plant on the banks of the Penobscot River in Orrington.[2]  One of Mallinckrodt's corporate predecessors constructed the plant on a 235-acre site adjacent to the river in 1967.  The plant used a mercury-cell process to produce chlorine and other chemical products used primarily in Maine's paper industry.  Byproducts of this process, including thousands of tons of mercury-contaminated brine-sludge and other hazardous waste, remain stored in five landfills located on the site.  Approximately seventy-seven acres of the site are contaminated by various hazardous substances including mercury, chloropicrin, carbon tetrachloride, and tetracholoroethene.  Hazardous substances from the site have been discharged both into the Penobscot River and into the air.

[¶3]  The United States Environmental Protection Agency (EPA) first became involved in managing the site in 1986 when it entered into an administrative agreement with the site's owners to investigate conditions at the site.  HoltraChem Manufacturing Company, LLC, acquired the plant in 1994. Mallinckrodt and HoltraChem cooperated with the EPA and the Maine Department

---

[2]  Mallinckrodt does not contest its status as a responsible party in this appeal.

of Environmental Protection (the Department) to perform a site investigation in 1995 and 1998.

[¶4] The plant ceased operations in 2000. Since HoltraChem's dissolution in 2001, the EPA and the Department have dealt exclusively with Mallinckrodt on issues related to the site, including the development of possible alternatives for remediating the site. The Town of Orrington became the owner of the site by virtue of a tax lien certificate filed in 2002 and subsequent foreclosure in 2003.

[¶5] Mallinckrodt worked cooperatively with the EPA and the Department for several years. During that time, the Department developed and considered four options for remediating the site: Option 1 would require moving and consolidating the contents of one of the landfills into an on-site unit without a liner; Option 2 would require moving and consolidating all five landfills into an on-site unit without a liner; Option 3 would require moving and consolidating all five landfills into an on-site unit with a liner; and Option 4, which was referred to as the "dig-and-haul" remedy, would require excavating all five landfills and shipping their contents offsite. Option 1 was attractive because it would result in the least amount of air emissions but would achieve environmental-protection results comparable to those provided by the other options. Option 1 would take the least amount of time, result in fewer transportation issues, and, at an estimated cost of $46 million, be the least expensive of the four options. In contrast, Option 4, the

4

"dig-and-haul" remedy, was the most expensive, with estimated costs exceeding $200 million. It would also result in the highest level of mercury air emissions.

[¶6]  During the summer of 2004, the Maine People's Alliance[3] (MPA), which had been monitoring the Department's efforts to ensure that the site was cleaned up, prepared to launch a media campaign to attack the delay in the cleanup of the site. It sought Governor John Baldacci's cooperation in its efforts. In September 2004, the MPA and the Governor issued a joint press release calling for the accelerated cleanup of the site.

[¶7]  Department staff concluded that Option 3 would be the most cost-effective and the most protective of public health. They recommended this option to the Governor, but the Governor strongly preferred the "dig-and-haul" remedy. In September 2005, the Governor and the Commissioner of the Department held a press conference announcing that the "dig-and-haul" remedy would be undertaken.

[¶8]  Between 2005 and 2008, Mallinckrodt continued to monitor groundwater at the site, operate and maintain a wastewater treatment system, and dismantle and remove infrastructure and mercury-contaminated debris; however, it did not excavate the landfills. In November 2008, the Commissioner issued an

---

[3]  The 2004 press release included in the record describes the MPA as "a statewide, nonprofit, membership organization committed to citizen democracy and economic, environmental, political and social justice . . . [c]omprising more than 23,000 members . . . ."

order pursuant to Maine's Uncontrolled Hazardous Substance Sites Law (the UHSSL), 38 M.R.S. § 1365(1)(B) (2013), requiring Mallinckrodt to excavate all five landfills and to transfer the contaminated materials offsite in accordance with the "dig-and-haul" remedy announced in 2005. Mallinckrodt appealed the order to the Board of Environmental Protection and requested a hearing pursuant to 38 M.R.S. § 1365(4) (2013).[4]

[¶9] Before the hearing, the Board conducted several conferences with the parties to address procedural issues. The presiding officer issued a total of thirteen procedural orders detailing the outcomes of these pretrial conferences and explaining specific procedures that would be followed.[5] The Board issued a "Procedures Document," which was developed with input from the parties and set forth procedural guidelines relating to issues such as the location of the hearing, serving and filing of papers, and prefiled testimony. Mallinckrodt moved to dismiss the appeal on the grounds that no procedural rules had been formally adopted, but the Board's presiding officer orally denied the motion at a prehearing conference. The presiding officer also denied Mallinckrodt's request that it be

---

[4] Mallinckrodt also filed a complaint in the U.S. District Court for the District of Maine challenging the constitutionality of the Uncontrolled Hazardous Sites Law and seeking to enjoin enforcement of the Commissioner's order. *Mallinckrodt LLC v. Littell*, 616 F. Supp. 2d 128 (D. Me. 2009). Mallinckrodt requested a stay of the administrative proceedings pending the outcome of the federal case. The U.S. District Court dismissed Mallinckrodt's claim on abstention grounds. *See id.*

[5] Mallinckrodt unsuccessfully appealed several of these orders to the full Board.

allowed to present evidence of alleged political bias resulting from the Governor's involvement in the remedy-selection process. However, she ruled that Mallinckrodt would be permitted to challenge witnesses' credibility by cross-examining them about whether their testimony may have been tainted by bias.

[¶10] The Board retained an outside consultant to assist in its consideration of technical evidence because the Commissioner, being a party to the proceeding, was unable to serve in an advisory capacity. A Department staff member was tasked with performing a similar consulting function. The consultants' role was to summarize technical information presented by the parties, identify inconsistencies in the data, suggest questions to be asked of witnesses, and ask questions of witnesses at the direction of the presiding officer. The consultants would not offer testimony, and the Board ruled that, consequently, they would not be subject to cross-examination.

[¶11] The Board conducted a de novo evidentiary hearing over nine days in January and February 2010. In accordance with the Board's procedural orders, each party prefiled its witnesses' direct and rebuttal testimony. Over Mallinckrodt's objection, witnesses testified in panels grouped according to the subject matter of their testimony. During the Board's deliberations, the outside consultant provided charts and summaries of evidence that had been admitted

during the hearing. Similarly, the Department staff member who had been designated to act as a consultant offered opinions and provided documents summarizing and explaining the evidence relating to air emissions.

[¶12]  In August 2010, the Board issued an order affirming and partially modifying the Commissioner's order. As modified, the order required Mallinckrodt to excavate and transport materials from two of the landfills, cap the remaining landfills, develop and implement plans for extracting and testing groundwater, and continue to monitor conditions at the site. Mallinckrodt estimates that the cost of complying with the order will be approximately $130 million.

[¶13]  Mallinckrodt appealed, and the case was accepted for transfer to the Business and Consumer Docket, where Mallinckrodt also asserted an independent claim pursuant to 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-74) alleging due process violations. The court affirmed the Board's order and dismissed Mallinckrodt's section 1983 claim. Mallinckrodt then filed this appeal.[6]

---

[6] It is unclear whether Mallinckrodt intends to appeal the dismissal of its section 1983 claim in addition to the court's order affirming the Board's decision. Because Mallinckrodt's briefs contain no discussion of the substance of the section 1983 claim, or the court's reasons for dismissing it, we deem any arguments on this issue waived. See *Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quotation marks omitted)).

## II. DISCUSSION

A.   The Commissioner's Authority to Issue a Compliance Order

[¶14]  Mallinckrodt argues that the Commissioner lacked statutory authority to issue a compliance order pursuant to the UHSSL because the plain language of the relevant provision must be read to authorize the Commissioner to take such action only in the event of an emergency.  Mallinckrodt contends that if the Department wished to require remediation at the site, the appropriate remedy would have been for the Attorney General to file an action in Superior Court.

[¶15]   Title 38 M.R.S. § 1365(5) (2013) provides that "[t]he Attorney General may file suit in Superior Court to compel any responsible party to abate, clean up[,] or mitigate threats or hazards posed or potentially posed by an uncontrolled site."  Title 38 M.R.S. § 1365(1) (2013) provides, in relevant part:

> Upon finding, after investigation, that a location at which hazardous substances are or were handled or otherwise came to be located may create a danger to the public health, to the safety of any person or to the environment, the commissioner may:
>
> A. Designate that location as an uncontrolled hazardous substance site;
>
> B. Order any responsible party[7] dealing with the hazardous substances to cease immediately or to prevent that activity and

---

[7] "Responsible party" is defined, in relevant part, as "[a]ny person who owned or operated the uncontrolled site from the time any hazardous substance arrived there." 38 M.R.S. § 1362(2)(B) (2013). "Uncontrolled hazardous substance site," or "uncontrolled site," is defined as "an area or location, whether or not licensed, at which hazardous substances are or were handled or otherwise came to be located, if it is concluded by the commissioner that the site poses a threat or hazard to the health, safety or

to take an action necessary to terminate or mitigate the danger or likelihood of danger; and

C. Order any person contributing to the danger or likelihood of danger to cease or prevent that contribution.

[¶16]  The responsible party must "immediately" comply with an order issued pursuant to section 1365.  38 M.R.S. § 1365(4).  Within ten working days of receiving the order, the person to whom the order is directed may apply to the Board for a hearing; the Board must hold a hearing, make findings of fact, and vote on a decision to continue, revoke, or modify the order within fifteen working days after receiving the application.[8] *Id.*

[¶17]  When the Business and Consumer Docket sits as an intermediate appellate court to review an agency decision pursuant to M.R. Civ. P. 80C, we review the agency's decision directly for errors of law.  *Ford Motor Co. v. Darling's*, 2014 ME 7, ¶ 15,   --- A.3d ---; *see also Sinclair Builders, Inc. v. Unemployment Ins. Comm'n*, 2013 ME 76, ¶ 9, 73 A.3d 1061.  Matters of statutory interpretation are reviewed de novo by looking "to the plain meaning of the statute, interpreting its language to avoid absurd, illogical[,] or inconsistent results." *Sinclair Builders, Inc.,* 2013 ME 76, ¶ 10, 73 A.3d 1061 (quotation marks

---

welfare of any person or to the natural environment and that action under this chapter is necessary to abate, clean up or mitigate that threat or hazard."  38 M.R.S. § 1362(3) (2013).

[8]  Due to the complex nature of this case, Mallinckrodt and the Board agreed to waive the Board's hearing and decision deadlines.

10

omitted). However, "[w]hen a statute administered by an agency is ambiguous, we review whether the agency's interpretation of the statute is reasonable and uphold its interpretation unless the statute plainly compels a contrary result." *Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 23, 58 A.3d 1083 (quotation marks omitted).

[¶18]　Contrary to Mallinckrodt's argument, the plain language of 38 M.R.S. § 1365(1) does not compel the conclusion that it applies only in the case of an emergency. First, although Mallinckrodt asserts that it is not currently "handling" hazardous substances at the site, the statute explicitly applies to sites at which hazardous materials "are *or were* handled *or otherwise came to be located*." 38 M.R.S. § 1365(1) (emphasis added). There is no dispute that hazardous materials have been handled on the site and that they are currently located there.

[¶19]　Second, Mallinckrodt's argument that the Legislature's use of the word "danger" indicates only immediate emergencies is undercut by a plain reading of the entire provision.[9] The Commissioner is empowered to make an order when a location containing hazardous substances "*may create* a danger." *Id.* (emphasis added). Similarly, it may order a responsible party to take action "necessary to terminate or mitigate the danger *or likelihood of danger*." 38 M.R.S. § 1365(1)(B) (emphasis added). This language indicates that the Commissioner

---

[9] There is no statutory definition of "danger." *See* 38 M.R.S. § 1362 (2013).

may issue an order pursuant to this subsection even if the danger has not yet materialized.

[¶20] Finally, Mallinckrodt argues that, because the remedy that the Commissioner ordered was a "cleanup," the Commissioner was only authorized to proceed in Superior Court pursuant to 38 M.R.S. § 1365(5). Mallinckrodt contends that if the Commissioner is permitted to proceed pursuant to 38 M.R.S. § 1365(1) in these circumstances, 38 M.R.S. § 1365(5) is rendered surplusage. *See Cent. Me. Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 8, 68 A.3d 1262 ("All words in a statute are to be given meaning, and no words are to be treated as surplusage if they can be reasonably construed." (quotation marks omitted)).

[¶21] However, "[w]e also construe the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Id.* (quotation marks omitted). Here, it is possible to construe these provisions harmoniously. Whereas 38 M.R.S. § 1365(1)(B) authorizes the Commissioner to order responsible parties to take action to terminate or mitigate the danger or likelihood of danger posed by a hazardous substance site, 38 M.R.S. § 1365(5) permits the *Attorney General* to file suit in Superior Court to abate, clean up, or mitigate threats or hazards posed or potentially posed by an uncontrolled site. A plain reading of these provisions indicates that the Commissioner does not have the authority to independently file a

civil action in Superior Court; only the Attorney General does. We construe these provisions as authorizing the Commissioner to unilaterally issue orders subject to de novo review and, separately, permitting the Attorney General to file an action in Superior Court. [10] Accordingly, we conclude that the Commissioner was authorized to issue the order.

B. The Administrative Procedure Act

[¶22] Mallinckrodt argues that the Board was required to adopt rules of practice governing UHSSL hearings and that its failure to do so rendered the Board's final order legally ineffectual. The Department argues that Maine's Administrative Procedure Act (APA), 5 M.R.S. § 8051 (2013), requires adoption of new procedural rules only when there is no existing statutory framework to guide the proceedings, and that the APA itself, read in conjunction with the UHSSL, provides adequate procedural rules. The Department further argues that, in any event, Mallinckrodt cannot demonstrate that it was prejudiced by the Board's failure to adopt specific rules to govern the proceedings.

[¶23] The APA provides, in relevant part: "[E]ach agency shall adopt rules of practice governing the conduct of adjudicatory proceedings . . . except to the

---

[10] Additionally, 38 M.R.S. § 1368 (2013), which authorizes the Commissioner to work with the Governor and the Commissioner of Public Safety to take control of the site and to take any other necessary action in the event of an emergency, does not suggest that the appropriate procedure in an emergency is to issue an order pursuant to 38 M.R.S. § 1365(1).

extent that such rules are provided by law." 5 M.R.S. § 8051. A "rule" is defined as

> the whole or any part of every regulation, standard, code, statement of policy, or other agency guideline or statement of general applicability, including the amendment, suspension or repeal of any prior rule, that is or is intended to be judicially enforceable and implements, interprets[,] or makes specific the law administered by the agency, or describes the procedures or practices of the agency.

5 M.R.S. § 8002(9)(A) (2013). Excluded from the definition of rule are "[p]olicies or memoranda concerning only the internal management of an agency" and "[a]ny form, instruction or explanatory statement of policy that in itself is not judicially enforceable, and that is intended solely as advice to assist persons in determining, exercising[,] or complying with their legal rights, duties or privileges." 5 M.R.S. § 8002(9)(B)(1), (9)(B)(4) (2013).

[¶24] The Department's governing statute declares that all of its hearings "must be conducted in accordance with the procedural requirements of the Maine Administrative Procedure Act, Title 5, chapter 375." 38 M.R.S. § 345-A(2) (2013). The APA establishes basic procedural requirements for administrative hearings, including notice requirements, the requirement that a hearing be held, exceptions to the rule that hearings must be held, provisions for public participation, and provisions concerning the type of evidence to be admitted.

*See* 5 M.R.S. §§ 9051-9064 (2013). In addition, some procedural guidelines specific to UHSSL proceedings are provided in 38 M.R.S. § 1365(4).

[¶25]  Mallinckrodt urges us to conclude that this case is comparable to *New England Whitewater Center, Inc. v. Department of Inland Fisheries and Wildlife*, in which we observed that an agency's "failure . . . to comply with the rulemaking provisions of the [APA] is a procedural defect that we cannot overlook even should we conclude there is no showing of prejudice." 550 A.2d 56, 64 (Me. 1988). In that case, the Department of Inland Fisheries and Wildlife instituted new regulations limiting the number of passengers that could be transported on commercial rafting trips in the Kennebec and Penobscot Rivers. *Id.* at 57-58. To allocate the number of passengers that each rafting company could carry, the Department created a new scoring system, but did not inform the applicants of the scoring criteria. *Id.* at 58, 63-64. We concluded that the scoring system met the statutory definition of a rule because it was meant to be judicially enforceable and that it was invalid because it had not been adopted pursuant to APA guidelines. *Id.* at 63-64.

[¶26]  "An agency must comply with the APA before it adopts a rule; otherwise the rule has no legal effect." *Roderick v. State*, 2013 ME 34, ¶ 9, 79 A.3d 368; 5 M.R.S. § 8057(1) (2013). Here, however, the Board did not adopt any new rules. Its governing statute provides that its hearings are to be regulated

by the requirements set out in the APA. *See* 38 M.R.S. § 345-A(2). Mallinckrodt's argument that no preexisting rules governed the proceeding therefore fails. We have observed that, "[i]n the absence of a controlling agency rule or a contrary requirement of statutory and constitutional law, the [ad hoc] procedure adopted by an administrative agency in any particular case should receive the deferential respect of a reviewing court." *Town of Wiscasset v. Bd. of Envtl. Prot.*, 471 A.2d 1045, 1048 (Me. 1984). The thirteen procedural orders issued by the Board over the course of the proceedings were not rules of general applicability; rather, they provided specific guidance to the parties concerning how the rules would be applied and how the case would progress. These are the types of ad hoc procedural decisions we affirmed in *Town of Wiscasset*, 471 A.2d at 1049. "Such flexibility and adaptability, when exercised fairly, is essential to an effective administrative response to a complex regulatory task." *In re Me. Clean Fuels, Inc.*, 310 A.2d 736, 744 (Me. 1973). Accordingly, the Board committed no error in conducting the proceedings in accordance with statutorily provided rules rather than promulgating its own. *See* 5 M.R.S. § 8051.

C.    Cross-Examination of Board Consultants

[¶27]    Mallinckrodt contends that the two consultants who assisted the Board in evaluating technical evidence served in effect as expert witnesses and that

16

the advice they offered should have been subject to cross-examination. Before the de novo hearing, the Board issued a procedural order explaining:

> The consultant will assist Board staff (Executive Analyst) with summarizing technical information presented by the parties, identifying data/information gaps and inconsistencies that should be explored, formulating suggested questions to be asked of witnesses at the hearing, and asking questions of witnesses at the Presiding Officer's discretion. The consultant will not be conducting independent studies of the site, but rather assisting the Board in its review of the evidence presented by the parties. The consultant will not offer testimony and will not be subject to cross-examination. Documents produced by the consultant will be available to the parties and included in the record.

[¶28] Pursuant to the APA, "every party shall have the right . . . to make oral cross-examination of any person present and testifying." 5 M.R.S. § 9056(2). The Board is permitted by statute to have "the aid or advice of those members of his own agency staff, counsel or consultants retained by the agency who have not participated and will not participate in the adjudicatory proceeding in an advocate capacity." 5 M.R.S. § 9055(2)(B) (2013). Such advisors are not subject to cross-examination. *See Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 25, 967 A.2d 676.

[¶29] Mallinckrodt characterizes the consultants as expert witnesses. We note that Mallinckrodt did not object to the consultants' involvement in the

Board's decision-making.[11] Thus, we review only for obvious error affecting substantial rights. *See Town of China v. Althenn*, 2013 ME 107, ¶ 12, 82 A.3d 835. We conclude that the Board committed no error by precluding Mallinckrodt from cross-examining the consultants because the consultants did not offer testimony. *See Reilly v. United States*, 863 F.2d 149, 159 (1st Cir. 1988) ("If . . . the advisor was not an evidentiary source, there was neither a right to [cross-examine] him . . . nor a purpose in doing so."); *Thomas v. Me. State Ret. Sys.*, No. AP-07-27, 2008 WL 4106400 (Me. Super. Apr. 8, 2008) (concluding that a memorandum "provided in [an] advisory capacity . . . is not . . . testimony." (quotation marks omitted)). Although the Board's consultants spoke on the record, they did so only during deliberations. The documents they provided to the Board contained summaries of evidence that had already been admitted, and the opinions they offered were based on information provided by the parties. Because the consultants did not serve in an advocate capacity, the Board was entitled to rely on their advice, 5 M.R.S. § 9055(2)(B), and was not required to permit the parties to cross-examine them.

---

[11] Counsel for the Town of Orrington engaged in a colloquy with the Presiding Officer concerning the role of the consultants, observing that having to "sit by and say nothing" as the consultants offered advice to the Board "create[d] an odd situation." No party specifically objected to the Board's use of consultants, or the Board's refusal to allow parties to cross-examine the consultants.

18

## D.    Evidence of Political Bias

[¶30]  Finally, Mallinckrodt contends that the Board abused its discretion by excluding evidence that the Commissioner's original order was tainted by political bias.  The Board's fifth procedural order held that "any political pressure exerted in the Commissioner's process is not relevant to the Board's [decision-making] process," but provided that "the parties retain the right as part of any cross-examination to ask questions that relate to the credibility of the witness and therefore the reliability of the testimony offered by that specific witness for inclusion in the Board's record."

[¶31]  Pursuant to the APA, "every party shall have the right to present evidence and arguments on all issues . . . ." 5 M.R.S. § 9056(2) (2013).  "Evidence shall be admitted if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs," but "[a]gencies may exclude irrelevant or unduly repetitious evidence."  5 M.R.S. § 9057(2) (2013).  We review for an abuse of discretion an administrative agency's decision to exclude evidence. *Hale-Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶ 16, 691 A.2d 1232.

[¶32]  In the appeal of the Commissioner's order, the Commissioner must "first establish the basis for the order and for naming the person to whom the order is directed." 38 M.R.S. § 1365(4).  "The burden of going forward then shifts to the person appealing to demonstrate . . . that the order should be modified or

rescinded." *Id.* Although it would be reversible error to exclude evidence that is relevant and highly probative, *see Berry v. Me. Pub. Utils. Comm'n*, 394 A.2d 790, 794 (Me. 1978), here the Board reasoned that, because it was conducting a de novo review, evidence relating to the Commissioner's subjective motivation for selecting a remedy was irrelevant. The Board concluded that, pursuant to 38 M.R.S. § 1365(4), its only objective was to determine whether the Commissioner could meet its burden of establishing that environmental-protection concerns provided a scientific and technical basis for the order. We accord great deference to the Board's interpretation of its enabling statute. *See S.D. Warren Co.*, 2005 ME 27, ¶ 4, 868 A.2d 210. The Board did not abuse its discretion by determining that evidence of the Governor's political motivation for recommending the "dig-and-haul" remedy was irrelevant to its decision on the merits of the Commissioner's order.

[¶33]  Additionally, we note that the Board was not entirely dismissive of Mallinckrodt's concerns. The Board's procedural order concerning this issue specifically provided that Mallinckrodt would retain the right to cross-examine witnesses about whether bias affected their testimony. This approach was appropriate given that the Board was assessing only the scientific justification for the remedy the Commissioner ordered. Notwithstanding Mallinckrodt's arguments to the contrary, this case does not present the same concerns that we addressed in

*York Hospital v. Department of Human Services*, 2005 ME 41, 869 A.2d 729. That case involved an allegation that an agency's decision-making process was itself biased. *Id.* ¶ 12. Mallinckrodt does not assert that political influence was exerted on the Board; we are therefore not convinced that the Board's exclusion of evidence relating to the Commissioner's possible political bias amounted to an abuse of discretion.

[¶34] We find that Mallinckrodt's additional arguments are unpersuasive and do not merit further discussion.

The entry is:

Judgment affirmed.

---

**On the briefs:**

> Jeffrey D. Talbert, Esq., Sigmund D. Schutz, Esq., and David B. Van Slyke, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Portland, for appellants Mallinckrodt US LLC and United States Surgical Corporation
>
> Janet T. Mills, Attorney General, and Peter B. LaFond, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee Department of Environmental Protection
>
> Eric M. Mehnert, Esq. and Cynthia M. Mehnert, Esq., Hawkes & Mehnert, LLP, Bangor, for appellee Maine People's Alliance

**At oral argument:**

Jeffrey D. Talbert, Esq., for appellants Mallinckrodt US LLC and United States Surgical Corporation

Peter LaFond, Asst. Atty. Gen., for appellee Board of Environmental Protection

Eric M. Mehnert, Esq., for appellee Maine People's Alliance

Business and Consumer Docket docket number AP-2011-02
FOR CLERK REFERENCE ONLY