ENTERED DEC 3 0 2014

STATE OF MAINE

KENNEBEC, ss

JONATHAN R. DAY,

      Petitioner

      v.

BOARD OF ENVIRONMENTAL

PROTECTION,

      Respondent

SUPERIOR COURT

CIVIL ACTION

DOCKET NO. AP14-23

JM-KEN-12-22-14

DECISION

Before the court is a M.R. Civ. P. 80C appeal by Petitioner Jonathan Day from a decision of the Maine Board of Environmental Protection ("Board") affirming the Commissioner of the Maine Department of Environmental Protection's ("DEP") approval of party-in-interest Carol Reece's permit application under the Maine Natural Resources Protection Act ("NRPA"). Ms. Reece applied to the DEP for a permit to construct a walkway, lawn and driveway on a frontal dune and an access way on the back dune of her lots on Popham Beach in the town of Phippsburg, Maine. The Board affirmed the DEP's findings and approval of Ms. Reece's project.

Petitioner Day appeals the Board's Decision contending that the Board and DEP erred in finding:

> 1) Ms. Reece's alleged "driveway" was not a road;
> 2) Section 5(C) of the Coastal Sand Dune Rules (the "Rules") applies only to "buildings" and, even if it applied to Ms. Reece's project, was satisfied;
> 3) Ms. Reece's alleged "lawn" was not a "parking area" or a "development;" and
> 4) Ms. Reece's project would not unreasonably interfere with the existing scenic and aesthetic uses of Popham Beach.

The Court grants Petitioner's appeal regarding the interpretation and application of Section 5(C) of the Rules, denies the remainder of Petitioner's appeal, vacates the Board's Order, and remands the case for entry of an Order denying the application of Ms. Reece for failure to comply with section 5(C) of the Rules.

On March 13, 2013, Carol Reece filed a permit application for development within a frontal and back dune of a coastal sand dune system pursuant to the NRPA. Ms. Reece owns an undeveloped, 10,000 square foot parcel of land located in the frontal dune. During the DEP's review process, Ms. Reece amended her application and site plan three times from the original submission. Ms. Reece's proposed project does not include any buildings. Instead, the project is designed to enable Ms. Reece to use her land on a seasonal basis during the summer months, including the use of a camper or RV. The project involves removing vegetation and grading in specific areas in order to construct a gravel access way along a 10-foot wide by 450-foot long portion of two proposed unaccepted ways (Gosnold Street and Riverview Avenue). The unaccepted ways are also known as paper streets, and are located in the back dune. The proposed gravel driveway, in the frontal dune, would be approximately 12 feet wide by 15 feet long and would extend over a portion of the paper street known as Riverview Avenue, extending from the access way to Ms. Reece's lot. Ms. Reece also proposed establishing 1,800 square feet of lawn and a 130-square foot walkway on her property in the frontal dune, which combined would cover approximately 19% of her lot.

The DEP obtained reviews from other State agencies including the Maine Department of Inland Fisheries & Wildlife ("IFW"), regarding wildlife habitat, and

2

the Maine Geological Survey ("MGS"), regarding location of the V-Zone,[1] delineation of the frontal dune, and erosion. DEP staff conducted several site visits. During the review process, the DEP received and considered comments and evidence from many members of the public, including Petitioner. On July 31, 2013, the DEP Commissioner issued a draft order which would approve the proposed project. Comments on the draft order were received from Ms. Reece, Petitioner, and members of the public. On August 16, 2013, the Commissioner approved the permit application. On that same day, the Commissioner issued a corrected order to include standard conditions that were inadvertently omitted in the original order. The Commissioner's Order (the "DEP Order") found that the proposed project met the licensing standards in NRPA and the Sand Dune Rules and approved the permit subject to specified conditions.

Two appeals of the DEP Order were filed with the Board on September 16, 2013. One appeal was filed by Petitioner and the other was by Mary Small, Ann Wong, and John McCarthy, Jr. The appeals were consolidated and on March 6, 2014, the Board heard and denied the appeals, affirming the DEP Order (the "Board Order"). Petitioner filed a timely Petition for Review to the Superior Court.

"When a dispute involves an agency's interpretation of a statute it administers, the agency's interpretation, although non conclusive is entitled to great deference and will be upheld unless the statute plainly compels a contrary result."

---

[1] The V-Zone is defined by the Rules as "[t]hat land area of special flood hazard subject to a one-percent or greater chance of flooding in any given year, and subject to additional hazard from high velocity water due to wave action. Wave heights or wave run-up depths are equal to or greater than 3 feet in V-Zones. V-Zones are as identified on the effective Flood Insurance Rate Maps and any subsequent Letters of Map Changes issued by FEMA." 06-096 C.M.R. Ch. 355, § 3(JJ).

*FPL Energy Maine Hydro LLC v. Dep't of Envtl Prot.*, 2007 Me 97, ¶ 11, 926 A.2d 1197 *cert. denied* 552 U.S. 1100 (2008) (quoting *Town of Eagle Lake v. Comm'r Dep't of Educ.*, 2003 ME 37, ¶ 8, 818 A.2d 1034). If a statute is ambiguous, the court reviews the agency's construction to assess whether it is reasonable. *Town of Eagle Lake*, 2003 ME 37, ¶ 8, 818 A.2d 1034. The court will not "second-guess" an agency on issues within its area of expertise; rather, the court reviews only to ascertain whether its conclusions are "unreasonable, unjust, or unlawful." *Id.* (quoting *Wood v. Superintendent of Ins.*, 638 A.2d 67, 71 (Me. 1994)). When reviewing an agency's statutory interpretation, the Court looks first to the plain meaning of the words to discern the real purpose, looking to avoid absurd, illogical or inconsistent results. *Mallinckrodt U.S., LLC v. Dep't of Envtl Prot.*, 2014 ME 52, ¶ 17, 90 A.3d 428; *FPL Energy*, 2007 ME 97, ¶ 12, 926 A.2d 1197.

Similarly, "[i]n reviewing an agency's interpretation of its own rules, regulations, or procedures, we give considerable deference to the agency and will not set aside the agency's interpretation unless the regulation or rule compels a contrary result." *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74 (quoting *Nelson v. Bayroot, LLC*, 2008 ME 90, ¶ 17, 953 A.2d 378). The party attempting to vacate the agency's decision bears the burden of persuasion. *Id.* If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision. *Id.* (citing *Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. "An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeds the bounds

4

of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id.*

An agency's factual findings "will be vacated only if there is no competent evidence in the record to support a decision." *Friends of Lincoln Lakes v. Bd. of Envtl Prot.*, 2010 ME 18, ¶ 14, 989 A.2d 1128. When reviewing factual findings, a court should not substitute its judgment for that of the fact finding agency. *Id.* at ¶ 12. A court must affirm the agency's "findings of fact if they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Id.* at ¶ 13.

Petitioner contends the Board and DEP committed an error of law in finding that the "approximately 180-square foot driveway" Ms. Reece seeks to construct is a "driveway" and not a "road." This determination is important because section 6(B) of the Rules prohibits the development of new structures, including "roads," on a frontal dune, but permits the construction of "driveways." *See* 06-096 C.M.R. ch. 355, §6(B)(1) (2012). NRPA and the Rules do not define the terms "driveway" or "road."

The DEP Order found that the "proposed driveway will provide access from the proposed access way to the applicant's property so that she can drive a vehicle onto her property" and that, as a result, the "proposed driveway falls within the common understanding of 'driveway' and so falls within the exception for new construction in frontal dunes...." The Board Order affirmed the DEP Order explaining that "the proposed project meets the common definition and intended purpose of a driveway: to provide access to a lot."

Petitioner argues the normal understanding of the term "driveway" is not the route or way that provides access to a lot, but "how one moves from one point to another on the lot to get to the preferred location within the lot." Petitioner contends that under the definition utilized by the Board and DEP, "all portions of every street and every road adjacent to or in the vicinity of a lot would be a 'driveway.'" If that were the case, "each owner of the next 25 frontal sand dune lots could develop the portion of Riverview [Avenue] most adjacent to their lot and there would still never be a 'road,'" but only "a series of connected driveways that everyone can use." (emphasis in original). Petitioner contends that given the strong public policy and environmental objectives underlying NRPA and the Rules,[2] close calls and ambiguities should be resolved in favor of an interpretation restricting projects on coastal sand dunes.

Petitioner further argues that a "driveway" is considered to be a route of private access over private property to a particular point, with the existence of other structures at the end destination point. In support, Petitioner points to the Phippsburg Shoreland Zoning Ordinance, which defines "driveway" to mean "[a] vehicular access-way less than five hundred (500) feet in length serving two single family dwellings or one two family dwelling, or less" with the term "dwelling"

---

[2] Petitioner points to 38 M.R.S.A. §480-A which explains that the State's coastal sand dunes are resources of state significance and that some uses are causing the "rapid degradation" of these resources. Section 480-A also notes that "the cumulative effect of frequent minor alterations and occasional major alterations of these resources poses a substantial threat to the environment and economy of the State and its quality of life." Section 1 of the Rules echoes this sentiment stressing the fragile nature of the coastal sand dune systems and warning that "the extensive development of sand dune areas and the construction of structures increases the risk of harm to both the coastal sand dune system and the structures themselves." 06-096 C.M.R. ch. 355 § 1.

meaning a "fixed structure containing one or more dwelling units." Phippsburg, ME., Shoreland Zoning Ordinance § 18 (adopted June 9, 2009 as amended through May, 2012) Town of Phippsburg Website / Municipal Ordinances / Shoreland Zoning Ordinance (visited October 7, 2014). Ms. Reece's lot, Petitioner argues, does not satisfy this definition because it is undeveloped and not capable of being developed to add a building.

Respondent[3] counters that the DEP and Board Orders' interpretation of "driveway" is not contrary to the plain wording or intent of NRPA and the Rules and is entitled to deference. Respondent argues that the underlying findings of fact about the driveway's layout and purpose, fit within the exception under section 6(b)(1) and are supported by competent evidence. In particular, Respondent points to Ms. Reece's amended site plan and related communications showing the proposed driveway is only 15 feet long with an average width of 12 feet and that the purpose is to provide access from the proposed access way on Riverview Avenue into Ms. Reece's lot.

Respondent also argues that nothing in the Rules or in common understandings of the term driveway suggests, as Petitioner contends, that it must be located on a person's lot as opposed to being on an express easement or an implied easement/paper street as in the present case. Respondent asserts that it is not uncommon for a landowner's driveway to pass over land owned by another person on an easement or right-of-way. Furthermore, Respondent contends that

---

[3] This Decision refers to the Board as "Respondent" when addressing the arguments the Board made in opposition to Petitioner's M.R. Civ. P 80C appeal. The Decision refers to the "Board" as the "Board" when discussing the Board's underlying Order.

7

Petitioner misreads the DEP and Board Orders, which do not suggest that every road in the vicinity of a lot would constitute a driveway under the Section 6(B)(1) exception.

Respondent further argues that its interpretation of "driveway" does not violate the intent and spirit of NRPA or the Rules as there is no language compelling the Board to adopt an interpretation of "driveway" requiring the entire driveway be contained on the licensee's lot

Ms. Reece responds to Petitioner's argument by clarifying that only the 15 foot long "driveway" is being constructed in the frontal sand dune, not the access way on Riverview Avenue. Furthermore, Ms. Reece argues, the proposed driveway does not provide vehicular access to any other improvements on the frontal dune and does not become a "road" just because it is built on a paper street that could be developed into a road. Ms. Reece also argues the DEP and Board Orders did not err because the "most common meaning of 'driveway' is an improved area used for vehicular traffic to and from a public or private road to one or more parcels of land" and the "common meaning of 'road' is an improved area regularly used by several parties for vehicular traffic."

Petitioner replies that neither Respondent nor Ms. Reece offer a reasonable basis for labeling one portion of the access way a "road" and another portion a "driveway." Petitioner argues that in effect, Respondent and Ms. Reece argue that the last 15 feet of a "road" should be exempt from the prohibition of development of a road in a frontal sand dune. To illustrate this point, Petitioner attaches a number of exhibits to his reply brief showing the proposed development on the Riverview

8

Avenue paper street leading to the Reece lot, as well as other possible developments.. The exhibits purport to show that both a direct and winding course of road on Riverview Avenue leading to Ms. Reece's lot would be impermissible, so there is no reason to permit Ms. Reece's driveway simply because it runs on a perpendicular course into the access way. Petitioner categorizes the Board's finding as elevating form over substance and not a proper exercise of regulatory discretion.

Based on the assumption that Ms. Reece's driveway is indistinguishable from the access way, Petitioner reiterates his argument that under the Board's interpretation, all the other streets in the potential development would be "driveways" serving everyone in the area.

The Court affirms the Board and DEP Orders' determination that the term "driveway" means "to provide access to a lot" and that Ms. Reece's proposed "driveway" fits this definition. The terms "driveway" and "road" are ambiguous because they are not defined in NRPA or the Rules and can be defined in multiple ways. As a result, the Court gives considerable deference to the DEP and Board's interpretation. *Forest Ecology Network*, 2012 ME 36, ¶ 28, 39 A.3d 74. Accordingly, while Petitioner's definition of a "driveway" as "how one moves from one point to another on the lot to get to the preferred location within the lot" is reasonable, this does not demonstrate that the DEP and Board's interpretation is beyond the reasonable choices available to them or that Petitioner's definition is compelled by NRPA and the Rules.[4]

---

[4] Petitioner's citation to a different definition of "driveway" in the Phippsburg Shoreland Zoning Ordinance is unavailing as there is no evidence that the

9

Furthermore, Petitioner's warning that the DEP and Board's definition of "driveway" is overbroad lacks merit because the DEP and Board have yet to define the term "road" and could interpret that term in a manner that would limit the definition of "driveway." Similarly, Petitioner's contention that each owner of the next 25 frontal sand dune lots could develop their lots through a series of "driveways" mistakenly assumes that the access way from Riverview Avenue constitutes a driveway and not a road. The DEP and Board Orders do not make that finding. In addition, Petitioner's contention that NRPA and the Rules evince a strong intention to protect coastal sand dunes from over-development does not mean that the DEP and Board's interpretation of Ms. Reece's proposed 15-foot gravel "driveway" violates those goals. Indeed, the Rules themselves contemplate and exempt "driveways" from prohibited structures on frontal dunes. 06-096 ch. 355 §6(B). Finally, Petitioner's warning that the DEP and Board Orders permits every other lot owner to do as Ms. Reece has done is speculative and does not necessarily follow from the Orders. As Petitioner points out, NRPA warns of "the cumulative effect of frequent minor alterations[.]" 38 M.R.S.A. § 480-A. There is no reason why the DEP and Board could not take into account the cumulative effect of development along the dune lots and tailor the resulting permits accordingly. The Court should not speculate as to possible definitions or interpretations the DEP could adopt that might violate the Rules and NRPA.

Petitioner contends that the Board and DEP committed an error of law in effectively substituting the word "building" for the word "project" in section 5(C) of

ordinance's definition of "driveway" has any bearing on the use of that term under NRPA or the Rules.

10

the Rules and determining that the "severe damage" consideration section did not apply to Ms. Reece's proposed project. In addition, Petitioner contends the Board and DEP's conclusion that even if the severe damage consideration did apply, Special Conditions 4 and 5 would prevent any severe damage, has no scientific basis.

Section 5(C) provides:

> **Shoreline changes within 100 years.** A project may not be permitted if, within 100 years, the property may reasonably be expected to be eroded as a result of changes in the shoreline such that the project is likely to be severely damaged after allowing for a two foot rise in sea level over 100 years. Beach nourishment and dune restoration projects are excluded from this requirement."

06-096 C.M.R. ch. 355, §5(C). Chapter 355 section 3 contains the following pertinent definitions:

> **Project.** Any activity that is regulated pursuant to the NRPA and is located in a coastal sand dune system.... *Id.* at § 3(DD).
> **Building.** A structured design for habitation, shelter, storage, or as a gathering place that has a roof. For the purposes of this rule, the foundation is considered to be a part of the building. A porch with a roof, attached to the exterior walls of a building, is considered part of the building. *Id.* at § 3(F).
> **Severe Damage.** Damage that exceeds 50% of a building's value. *Id.* at § 3(GG).

In addition, the definition of "building's value" sets out two methods for establishing value and does not include associated site improvements. *See id.* at § 3(G).

When applying section 5(C) the DEP determined that in light of the definitions of "severe damage" and "building's value" the DEP has historically not applied the section to access drives, driveways or landscaped areas. The DEP also determined that even if section 5(C) applied, the mitigation and enhancement measures to enhance the dune with sand and native vegetation satisfy the standards for shoreline changes. The Board affirmed the Department's interpretation as

11

reasonable and consistent with the intent of the Rules. In the alternative, the Board found that even if the term "severely damaged" includes the entire project and not just buildings, the standard in section 5(C) was met based on Special Conditions 4 and 5 of the DEP Order to enhance the seaward extent of the frontal dune, and the fact that the proposed development would not restrict the movement of sand, wind, and water.

Petitioner contends the DEP and Board erred by adopting an overly narrow interpretation of section 5(C) by effectively replacing the word "project" with the word "building." Petitioner points out that it would have been simple to actually substitute the word "building" for "project" if there was an intent to limit the provision only to damage to buildings. In addition, Petitioner argues that under the DEP and Board's interpretation, the express exceptions for "beach nourishment" and "dune restoration projects" are rendered superfluous, as neither are "buildings."[5] (citing *Central Maine Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 8, 68 A.3d 1262).

Petitioner also argues that section 5(C) dovetails with section 1 regarding the protective purposes of NRPA. In particular, Petitioner points to language in section 1 providing that the DEP anticipates a two-foot sea level rise over the next 100 years and that as a result "the extensive development of sand dune areas and the construction of <u>structures</u> increases the risk of harm, to both the coastal sand dune

---

[5] "Dune restoration" is defined as "[r]estoration of a natural or artificially constructed dune through the addition of sand and planting of native dune vegetation" and "Beach nourishment" is defined as "[t]he artificial addition of sand, gravel, or other similar natural material to a beach or subtidal area adjacent to a beach." 06-096 C.M.R. ch. 355 § 3 (D) & (N).

12

system and the <u>structures</u> themselves." (citing 06-096 C.M.R. ch. 355 § 1) (emphasis added by Petitioner). In other words, section 1 indicates that section 5(C) speaks to development and structures, not just buildings.

Petitioner further contends that just because the regulation specifies what constitutes "severe damage" to a building, the entire scope of section 5(C) should not be limited solely to buildings. Petitioner argues there is no need to specifically define "severe damage" when it comes to lawns, driveways, roads and parking areas because it is more clear cut and readily apparent than severe damage to buildings. For example, Petitioner contends a lawn, driveway, or road is either 100% there or 100% gone, it lacks the nuance of damage to a building.

Finally, Petitioner challenges the Board and DEP's "fallback position" that even if the term severely damaged applies to the entire project, Special Conditions 4 and 5 of the DEP Order satisfy section 5(C). Petitioner argues the DEP and Board lacked evidence to determine that the mitigation and enhancement measures proposed by Ms. Reece would have any preventative impact regarding erosion. Indeed, Petitioner contends the evidence is to the contrary and points to the opinion of MGS employee Stephen Dickson concluding that the dune enhancement activity "will slightly (but not completely) reduce the risk of erosion on the site." Finally, Petitioner contends that because Ms. Reece's lots are subject to flooding and massive shifting of sand in any given year even without factoring in a two-foot rise in sea level, the Board's factual conclusion that section 5(C) is satisfied lacks support.

13

Respondent contends that the DEP has interpreted section 5(C) to apply to the construction or reconstruction of buildings and not to other development such as access drives, driveways, and landscaped areas since 2004, when the language in section 5(C) was adopted. Respondent claims its interpretation is supported by the use of the term "severely damaged" in section 5(C), which is defined—as the term "severe damage"—as "[d]amage that exceeds 50% of a building's value."(quoting 06-096 C.M.R. 355 §§ 3(GG), 5(C)). Because severe damage only speaks to buildings, Respondent argues it was logical and reasonable to determine that section 5(C) does not apply directly to Ms. Reece's project as no buildings are involved. Furthermore, Respondent argues that if "severe damage" was intended to apply to non-building projects, the Rules would have included an appropriate definition.

Respondent also claims the Board and DEP's interpretation makes sense when viewed in the context of sections 5 and 6 as a whole. Section 5 includes requirements for building reconstruction and building size restrictions, while section 6 regards reconstruction of buildings severely damaged by ocean storms. In addition, sections 6(C), (D), (E), and (F) are the only other sections in the Rules to use the term "severely damaged" and these sections refer only to buildings.

In addition, Respondent counters that the DEP and Board's interpretation do not render section 5(C)'s exceptions for "beach nourishment" and "dune restoration projects" inexplicable because section 5(C) simply makes clear that beach nourishment and dune restoration projects—which do not involve buildings—are excluded from the ambit of section 5(C). Respondent further points out that section 6(B)(5) allows the construction of new buildings on an undeveloped lot in a frontal

14

dune under certain circumstances, provided the new building is elevated on posts. Section 6(B)(5) is therefore consistent with the Board's interpretation of section 5(C) in that it contemplates erosion to the property due to shoreline change, but focuses on allowing buildings that are more resistant to future damage.

Even if section 5(C) applies to Ms. Reece's project, Respondent contends there is sufficient support for the Board's factual findings that the proposed access way, driveway, lawn, and walkway would not be expected to sustain severe damage in the event of a 2-foot sea level rise in 100 years. In making these findings, the Board considered that Ms. Reece is required by special conditions 4 and 5 to enhance the seaward extent of the frontal dune. These conditions are based on MGS comments that dune enhancement on Ms. Reece's lots will reduce the risk of erosion. In particular, MGS recommended that sand excavated for installing a septic holding tank be retained on the lot, shaped into natural dune landforms to mimic surrounding conditions, and vegetated with native plants including American beach grass to minimize erosion hazards. Furthermore, Respondent contends that conditions 4 and 5 of the DEP Order are also based on the DEP's review of the proposed project by the IFW and its recommendations based on habitat considerations. Ms. Reece agreed to implement MSG and IFW's recommendations.

The Board also considered the effects of special conditions 4 and 5 on reducing erosion potential and the fact that the proposed development would not restrict the movement of sand, wind, and water on the property. In particular, the Board determined that the access way and driveway will only involve specific areas for grading and vegetation removal and that the proposed use will allow the wind to

15

blow sand in the developed area, and therefore allow native dune grass to partially reestablish. Respondent contends these findings are supported by substantial evidence including the application and site plans, comments on the proposed project by MGS and maps and photos of the property.

Finally, Respondent contends that Petitioner appears to suggest that special conditions in the permit would need to eliminate the erosive power of a two-foot rise in sea level. Elimination of the effects of sea level rise, however, is not required by section 5(C). Instead, section 5(C) is based on the likelihood of severe damage caused by a two-foot sea level rise over 100 years. On this point, the DEP and Board made a factual determination that the project would not be expected to sustain severe damage, which the Court must give deference.

Ms. Reece responds that the DEP and Board's interpretation of section 5(C) does not render the beach restoration and sand dune nourishment exceptions superfluous because every project involving the construction of a building or structure in a sand dune is necessarily going to involve beach restoration or sand dune nourishment due to the need to build foundation in a sand dune and the mitigation and enhancement requirements of Section 5(I) of the Rules. Accordingly, the exceptions are included simply to allow the DEP to approve a project, even if some of the related beach restoration or sand dune nourishment is exposed to possible damage due to severe flooding.

At the worst, Ms. Reece argues, the beach restoration and sand dune nourishment exceptions render section 5(C) ambiguous. When regulatory language is ambiguous, Ms. Reece argues, the Court should interpret the language in favor of

the landowner. *Id.* (citing *Moyer v. Board of Zoning Appeals*, 233 A.2d 311, 316 (Me. 1967) ("Zoning laws, whether statutes or ordinances, inasmuch as they curtail and limit uses of real estate and are in derogation of the common law must be given a strict construction and the provision thereof may not be extended by implication").

Ms. Reece also contends that even if section 5(C) applies to Ms. Reece's project, Petitioner failed to present the DEP with any evidence that an extreme coastal flooding event would do severe damage to Ms. Reece's lawn, walkway, driveway or access way. While Petitioner points to an unsigned report from Robert Gerber, a consultant, Ms. Reece contends that "[t]he best Mr. Gerber can do is to predict that [Ms. Reece's] project will 'not remain stable' in 100 years, not that it will be 'severely damaged.'"

Petitioner replies that the Board and DEP have provided no evidence that the DEP has interpreted section 5(C) as only applying to buildings since 2004. Furthermore, Petitioner contends the history of section 5(C) belies the DEP's interpretation. Section 5(C) was not adopted in 2004, but amended a preexisting version that was formerly section 5(D).[6] The prior version read as follows:

> Shoreline changes within 100 years. Projects shall not be permitted if, within 100 years, the project may reasonably be expected to be damaged as a result of changes in the shoreline. Beach nourishment and dune restoration projects are excluded from this requirement.

---

[6] Petitioner claims section 5(C) was formerly section 5(D). This claim is likely based on the Board's response to comments regarding the Board's revision of the Rules in 2004. The Board, however, noted that section 5(C) was formerly section 5(D) in an earlier draft of the revised rules. The current section 5(C) was formerly section 3(A)(2). The language in former section 3(A)(2) is identical to that incorrectly cited by Petitioner as former section 5(D).

17

Therefore, by contending that the DEP has interpreted section 5(C) as limited to buildings since 2004, Respondent implicitly concedes that former section 5(D) applied to more than just buildings. In addition, Petitioner claims that Respondent does not point to any aspect of the rulemaking record leading to section 5(C) indicating the intent was to narrow its scope to buildings without substituting the word buildings for project.

Furthermore, Petitioner contends that sections 6(C), (D), (E), and (F)'s use of the term "severely damaged" supports Petitioner's position because each of those sections explicitly refer to "buildings." If the DEP had intended to limit section 5(C) to "buildings" it would have substituted that term for "project." It would not have changed the scope by changing the term "damaged" to "severely damaged." Since the term "project" is separately defined as much broader than "building," it is "inconceivable" that a substantial reduction in scope would have been implemented without expressly stating the provision was limited to buildings.

Petitioner also contends that Respondent's attempt to explain away beach nourishment and dune restoration projects actually confirms Petitioner's argument because there are a number of activities that are within the definition of project and/or structure that are not buildings. Since beach nourishment and dune restoration projects are not buildings, what other purpose is served by excepting two obvious non-building projects from a provision presumably already limited to buildings.

Turning to the DEP and Board's alternative position, Petitioner claims that the Board and DEP never made any fact finding regarding the possibility of severe

18

damage in the event of a two-foot sea level rise. Instead, the DEP merely commented that if Ms. Reece placed a septic system on the paper street any sand removed in that process would be used to enhance the seaward extent of the frontal dune, which could lessen erosion. Ms. Reece, however, is not required to install the septic system and may never do so. Petitioner further claims it is absurd to argue that the small amount of sand that would be extracted and moved to the front of the dune as a result of installing a septic system could alter the erosion effects of a two-foot sea rise level.

In addition, Petitioner argues the record contains no evidence suggesting the alleged beneficial impact from sand relocation is "even a remote possibility." The most the record contains is Mr. Dickson's comment that the so-called dune enhancement activity "will slightly (but not completely) reduce the risk of erosion on the site." The risk of erosion mitigated by special conditions 4 and 5 is the risk created by the project itself. It does not address the question of what might happen as a result of a two-foot sea level rise. Petitioner points out that Mr. Gerber addressed that issue and concluded that Ms. Reece's lots "will not remain stable after allowing for a two-foot sea level rise over 100 years and since these lots will be within range of tidal action, they will be subject to erosion. This is not even accounting for storm conditions."[7]

The Court finds the DEP and Board's interpretation of section 5(C) as applying only to buildings constitutes an abuse of discretion because it exceeds the bounds of reasonable choices available. While the Board and DEP's interpretation

[7] The version of Mr. Gerber's opinion in Record document 27, unlike Record document 72, is signed.

that section 5(C) only applies to buildings supported by the use of the term "severely damaged," which refers specifically to buildings, when section 5(C) is read as a whole and in the context of the Rules as well as the section's history, section 5(C) must be applied to all projects, not just "buildings."

First, adopting the DEP and Board's interpretation of section 5(C) would impermissibly render the rule's second sentence, excluding beach nourishment and dune restoration projects from the scope of the rule, meaningless and superfluous because beach nourishment and sand dune restoration projects are not buildings. *See Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 13, 17 A.3d 667. Even if beach nourishment and dune restoration projects were included because they occur in conjunction with the construction of any buildings, there would be no need to specifically exclude them from the scope of section 5(C) as they are not buildings.

Furthermore, while Respondent claims the DEP has utilized its interpretation of section 5(C) since 2004, it points to no evidence in support of this contention. In addition, the history of section 5(C) undercuts the DEP and Board's interpretation. The predecessor to section 5(C) provided:

> Shoreline changes within 100 years. Projects shall not be permitted if, within 100 years, the project may reasonably be expected to be damaged as a result of changes in the shoreline. Beach nourishment and dune restoration projects are excluded from this requirement.

06-096 C.M.R. ch. 355 § 3(A)(2) (1993) (emphasis added). It is extremely unlikely that the DEP, when revising section 5(C) to concern severe damage versus regular damage, intended to limit the scope of that section to "buildings" as opposed to easing the restrictions and permitting the construction of projects that will suffer

20

damage, but not severe damage from shoreline changes. Adding to this improbability is the absence of history regarding the revisions to section 5(C) indicating the DEP intended to adopt this novel approach to modifying the scope of section 5(C). Tipping the scale still further against the DEP and Board's interpretation is the DEP's demonstrated history of explicitly referring to "buildings" in all other instances when using the term "severely damaged." *See* 06-096 ch. 355 §§ 6(C), (D), (E), & (F). Accordingly, the plain language of section 5(C), its rulemaking history, and the use of the term "severely damaged" with direct reference to buildings in all other sections of the Rules compels an interpretation of section 5(C) as applying to all projects, not just buildings.

The Court also finds that the DEP and Board's conclusion that the proposed access way, driveway, lawn and walkway would not be expected to sustain severe damage in the event of a 2 foot sea level rise in 100 years is not supported by substantial evidence. *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 13, 989 A.2d 1128. The mitigation and enhancement measures upon which the Board and DEP rely on to find that "even if the term 'severely damaged'" applies to "all development (i.e., the entire project and not just buildings)," the "standard in Section 5(C) is met by the proposed project" pertain to reducing the risk of erosion on the site. The mitigation and enhancement measures do not speak to the likelihood of severe damage to the project in light of a two-foot rise in sea level over 100 years.

In contrast, Petitioner has pointed to evidence indicating Ms. Reece's lot, including her lawn, walkway, and driveway may reasonably be expected to suffer severe damages from shoreline changes. In particular, Mr. Dickson of the MGS,

21

when speaking on this point notes that "the ground on which the gravel parking and driveway is to be located is *likely to be eroded in the next 100 years* (that is the Erosion Hazard Area definition.)" (emphasis in original). Assuming that Ms. Reece's lot will suffer damages from a sea level rise, Mr. Dickson notes that whether section 5(C) applies to a gravel driveway and what the definition of "severely damaged" is in relation to gravel placed on a dune surface" is a determination for the DEP. In addition, a report from Mr. Gerber of Ransom Consulting, Inc. concludes that Ms. Reece's lot "will not remain stable after allowing for a 2-foot sea level rise over 100 years and since these lots will be within the range of tidal action at that time, they will be subject to erosion. This is not even accounting for storm conditions." While the DEP is not required to accept Messrs. Gerber or Dickson's opinions regarding the likelihood of severe damage due to sea level rise, the DEP is required to support its conclusion by substantial evidence in the record. Here, Respondent and Ms. Reece have pointed to no evidence in the record supporting the DEP and Board's conclusion that conditions 4 and 5 satisfy section 5(C).

Petitioner contends the Board and DEP committed an error of law in determining that Ms. Reece's "lawn" was not a "parking area" or a "structure." Section 6(B) of the Rules, states that except as otherwise provided, "a new structure or addition to an existing structure may not be constructed on or seaward of a frontal dune[.]" 06-096 C.M.R. ch. 355 §6(B). A "structure" or "permanent structure" is "any structure constructed or erected with a fixed location...for a period exceeding 7 months each year." *Id.* at § 3(AA). "Permanent structures include, but are not limited to: causeways, piers, docks, concrete slabs, piles,

22

marinas, retaining walls, buildings, swimming pools, fences, seawalls, roads, driveways, parking areas, and walkways." *Id.* Lawns are not mentioned in the definition. Lawns are, however, included in the definition of "development" which is "[t]he alteration of property for human-related use including, but not limited to: buildings, decks, driveways, parking areas, lawns, landscaped areas, and areas of non-native vegetation, and any other appurtenant facilities, but excluding temporary structures." *Id.* at § 3(L) (emphasis added).

The DEP Order assumed, without explanation, that the "lawn" Ms. Reece proposed to construct was indeed a "lawn."The Board Order explained that it considered the appellants' arguments and the intent of the Rules, but determined that lawns are not intended to be included in the definition of permanent structures. The Board Order explained that the distinction between lawns as developments, and parking areas as structures, is consistent with the relative permeability of lawns versus the imperviousness surface of most parking area. The Board Order further stated that it considered the intended use of the lawn and determined that seasonal parking on the lawn "does not mean the lawn fits within the definition of structure" and that the DEP has historically permitted lawns that meet the standards of the Rules without requiring special conditions limiting the activities that may occur on them. The Board Order implies, but does not explicitly state, that it considered Ms. Reece's lawn a "lawn" based on the permeability of the lawn and the desire to only use the lawn on a seasonal, and not year-round, basis.

Petitioner raises three arguments attacking the Board and DEP's determination that Ms. Reece's "lawn" was indeed a lawn and not a structure or

23

parking area. First, Petitioner argues that Ms. Reece initially applied to establish a parking area, but then amended her application to call the area a "lawn." Petitioner contends that the "lawn" is intended to serve the same purpose as a "parking area" and that the DEP and the Board erred in determining the area was a "lawn."

Second, Petitioner contends there is no authority for removing beach grass and frontal dune material just because Ms. Reece prefers typical lawn grass over native beach grass. Petitioner argues that "almost assuredly" any approval of lawns on frontal sand dunes in the past was limited to situations where structures utilized as dwellings were already in existence on the frontal dunes.

Third, Petitioner asserts that development and structure are given broader definitions in the context of NRPA and implementing regulations than might appear in other contexts. This is due to the underlying environmental protective purpose and substantially greater restrictions applicable to those sensitive areas.

Fourth, Petitioner points out that the definition of "structure" states that natural features like frontal dunes are not permanent structures. This is because permanent structures would otherwise include many things that are comprised of natural materials even if not natural to that area. Unlike a frontal dune, which is natural, placing several inches of loam and lawn grass, as Ms. Reece proposes, is not adding a "natural feature." Accordingly, Petitioner contends the "lawn" should fit within the definition of a structure. To emphasize this point, Petitioner contends that if someone excavated beach grass and frontal sand dune to make a long walkway comprised of a loam base and non-native grass, this would constitute a

24

walkway, which is defined as a permanent structure. The same reasoning should require the "lawn" to be treated as a permanent structure.

Respondent argues the DEP and Board Orders reasonably concluded Ms. Reece's lawn was not a structure and could be constructed in a frontal dune. Respondent points to the definition of "structure" as any structure constructed or erected...for a period exceeding 7 months each year" and points out that the list of structures does not include lawns. (quoting 06-96 ch. 344 § 3(AA)). In contrast, the definition of "development" expressly includes lawns. Furthermore, Respondent argues that the list of categories considered to be structures are generally impervious, while a lawn is permeable.

Respondent further argues the Rules do not make the lawn a structure just because it is intended to be used to park vehicles on a seasonal basis. Respondent also explains that while the Rules are intended to protect valuable coastal and sand dune systems, the Board determined that Ms. Reece's proposal to develop 19.3% of her lot fell within the intent of the rules and met the development standard in section 5(B).[8]

Finally, Respondent points out that Petitioner has provided no support for his contention that the "lawn" should be considered a parking area because it is not connected to an existing dwelling. Nothing in the Rules limits the development of a lawn to lots on which a dwelling exists.

Ms. Reece echoes Respondent's arguments and also explains that her application contains no construction profile or specific soil or seed specifications for

[8] Section 5(B) limits development on an individual lot to no more than 40%. 06-096 C.M.R. ch. 355 § 5(B)(1).

25

her lawn. As a result, her lawn will have to be constructed with normal materials used for a lawn with no special structural components making the lawn especially suitable for parking vehicles on a regular basis year round. Ms. Reece further asks the Court to take judicial notice of the fact that during summer months, parking motor vehicles and campers on improved and unimproved lots near the water is a common land use in Maine.

Ms. Reece also contends that the common meaning of "parking area" is an area of land improved with gravel and/or pavement where motor vehicles are regularly parked. Constructing a parking area therefore discourages the natural filtration of water into sand, whereas a lawn does not deter the ground's ability to absorb water. In addition, Ms. Reece argues that the Rules do not require her lawn to be specifically authorized by the Rules. To the contrary, the Rules allow any development that is not prohibited, as long as a permit is acquired from the DEP. Similarly, because nothing in the Rules addresses the nature of permissible vegetation on a lot, as long as the standards in sections 5 and 6 are satisfied, the development of a lawn with different vegetation is permissible.

Finally, Ms. Reece points out that the definition of structure does not say that everything that is not a natural feature is automatically a structure. Even if it did, Ms. Reece's lawn would not constitute a structure because even though her lawn is not naturally occurring, it does have natural features such as organic soils and grassy vegetation.

The Court finds that the Board and DEP Orders appropriately found that Ms. Reece's proposed lawn was in fact a "lawn" and constituted a "development," not a

26

structure. First, Petitioner offers no support for his argument that the Board and DEP erred in determining the "lawn" was not a "parking area" aside from Ms. Reece's modification of her original application to establish a "lawn" instead of a "parking area." Ms. Reece did not, however, simply modify the wording of her application. Instead, Ms. Reece amended her application to establish several inches of loam and lawn grass for the "lawn" instead of the originally proposed gravel parking area. Furthermore, there is no evidence indicating that the Rules prohibit the use of lawn grass as opposed to beach grass on frontal dunes as long as the standards in sections 5 and 6 of the Rules are satisfied.

Furthermore, the Board's interpretation of Ms. Reece's proposed lawn as a development, but not a structure does not constitute an abuse of discretion. "Lawns" are expressly included in the definition of development, but not the definition of structures. The Board's explanation that the reason for this is because lawns, unlike most structures, are permeable does not exceed the bounds of reasonable choices available to the Board. While this rationale is undercut by the inclusion of walkways, which could also be comprised of a loam base and non-native grass, in the definition of structures, the Court cannot say this discrepancy compels the DEP and Board to construe lawns as structures. *Forest Ecology Network*, 2012 ME 36, ¶ 28, 39 A.3d 74.

Petitioner argues the DEP and Board erred in determining that Ms. Reece's proposed project does not unreasonably interfere with the aesthetic and scenic beauty of the Popham Beachfront. This is because Ms. Reece's project will result in

parked cars and an RV on the primary frontal dune introducing a manmade object where none were previously visible.

Under NRPA, a proposed project may not "unreasonably interfere with existing scenic, aesthetic, recreational, or navigational uses. 48 MRS § 480-D(1). Scenic and aesthetic uses are human activities "arising from the unique scenic or aesthetic qualities of the resource." *Uliano v. Board of Environmental Protection*, 2009 ME 89, ¶ 18, 977 A.2d 400. "[W]hether a proposed activity will unreasonably interfere with an existing scenic or aesthetic use will necessarily depend on the specific circumstances of a given case.

The DEP Order stated in conclusory fashion that it did not identify any issues involving existing scenic or aesthetic uses. The Board Order concurred, explaining that the seaward extent of Ms. Reece's lot will remain undeveloped and that Ms. Reece's lot will include dune enhancements through adding sand and native plantings on her lot. The Board found that based on aerial photographs, the surrounding area is primarily developed as lots with residential structures with driveways, some of which contain walkways and lawns. The Board explained that while Ms. Reece's project will extend further seaward than the majority of existing development in the immediate, surrounding area, the profile of the lawn, walkway, driveway, and access way would not substantially alter the existing grade at the project site or result in a permanent structure that would obstruct existing views. As a result, the Board concluded that the project is not expected to unreasonably interfere with the general public's visual enjoyment and appreciation of a protected resource.

28

Petitioner contends the DEP and Board erred in concluding that Ms. Reece's project does not impact the aesthetic and scenic beauty of the Popham Beachfront because it will result in parked cars and an RV on the primary frontal dune beyond the tree line along the beach. Currently, looking north and south from Ms. Reece's lot, there are no manmade objects on the waterside of the tree line. Petitioner contends that the introduction of manmade objects beyond the tree line is an obvious change to the scenic and aesthetic beauty of Popham Beach.

Further, Petitioner contends that a campground, a half-mile around the point at Popham Beach does not set a precedent allowing the introduction of manmade objects. This is because the campground was established before NRPA or any other environmental protections were enacted in Maine. Were the campground proposed today, Petitioner contends it would not receive a permit.

Respondent argues that the Board's factual findings on scenic and aesthetic uses under 38 M.R.S. § 480-D(1) are supported by competent evidence. Respondent contends the Board considered that Ms. Reece sought a permit for an access way, driveway, lawn and walkway because these activities involve displacement of soil, sand, and vegetation in a protected natural resource as well as adding sand or material to a sand dune. The Board noted in its order that the seaward part of the lot will remain undeveloped and that Ms. Reece proposed enhancements to her lot by adding sand and native plants.

Furthermore, Respondent contends the Board considered Ms. Reece's project in light of information in the record concerning development of the surrounding area. Relying on aerial photographs, the Board found the surrounding area is mostly

developed with residential structures that include driveways, walkways, and lawns. Therefore, the Board had competent evidence to conclude that although Ms. Reece's project would extend further seaward than most of the existing development in the immediate area, the profile of Ms. Reece's proposed access way, driveway, lawn and walkway would not substantially alter the existing grade or result in a permanent structure that would obstruct existing views.

Respondent further points out that while Ms. Reece's project will result in parked cars and an RV on the frontal dune, the applicable standard is whether the activity will unreasonably interfere with existing scenic and aesthetic uses of the resource (38 MRSA § 480-D(1), not whether there will be a change to existing scenic and aesthetic uses which was Petitioner's proof.

Ms. Reece echoes Respondent's argument that NRPA does not prohibit "adverse effects," instead it prohibits unreasonable interference with scenic and aesthetic uses. Ms. Reece further argues the DEP and Board Orders should be affirmed because they are supported by specific findings of fact that the project will not unreasonably interfere with anyone's views based on a review of aerial photographs.

Ms. Reece further argues that Petitioner's argument is improperly premised on the possible existence of RVs or campers on her lot. Ms. Reese argues this is misguided because Ms. Reece does not need a permit from the DEP for the possible use of her lot to park a seasonal camper on her lawn. In other words, the DEP only considers the impact of the propose development of the lot, not the impact of every possible use of the lot once the development is complete.

30

Nevertheless, Ms. Reece claims the DEP was aware of Ms. Reece's intended use of the land and contends that "looking at a seasonal camper is [no] worse tha[n] looking at the many residences and related development" in the surrounding area.

The Court affirms the Board and DEP Orders' determination that Ms. Reece's project will not unreasonably interfere with scenic and aesthetic uses because it is supported by competent evidence. *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 14, 989 A.2d 1128. In particular, the Board and DEP considered aerial photographs demonstrating that the surrounding area is primarily developed, containing numerous lots "with residential structures with driveways, some of which contain walkways and lawns." In addition, the Board considered the fact that Ms. Reece's project would only be utilized on a seasonal basis, with no vehicles occupying the lot at the end of each season. Furthermore, the Board considered that the seaward extent of Ms. Reece's lot will remain undeveloped, that Ms. Reece will add sand and native plantings on her lot, and that her project will not substantially alter the existing grade. Accordingly, while Ms. Reece's project will result in a change to the existing scenic and aesthetic uses, for at least part of the year, the Court cannot substitute its judgment for that of the Board and DEP because their decision is supported by substantial evidence in the record. *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 12, 989 A.2d 1128.

For the reasons stated herein, the entry will be:

The Petitioner's appeal regarding the Board's interpretation and application of Section5(C) of its Rules is SUSTAINED; the Order of the Board of Environmental Protection in the matter of Carol Reece dated March 6, 2014, DEP

31

Order #L-25942-4H-A-N/L-25942-FS-B-N, is VACATED; REMANDED to the Board

for proceedings consistent with this DECISION.

Clerk may docket by reference.

December 22, 2014

JUSTICE, SUPERIOR COURT

Action:  <u>Petition for Review</u>            **J. Marden**      ~~J. Murphy~~
          80C

Jonathan R. Day           vs.        Department of Environmental Protection, et al.

| Plaintiff's Attorney | Defendant's Attorney |
| --- | --- |
| James D. Poliquin, Esq.<br>Two Canal Plaza<br>PO Box 4600<br>Portland, ME 04112-4600 | Mary Sauer, AAG<br>6 State House Station<br>Augusta, ME 04333-0006<br><br>Chris Neagle, Esq. (PII Reece)<br>PO Box 9711<br>Portland, ME 04104-5011 |

Date of Entry

| | |
| --- | --- |
| 4/8/14 | Petition for Review of Final Agency Action, filed (4/7/14). s/Poliquin, Esq. |
| 5/7/14 | Administrative Record, Certification of Record, and Index to Record, filed. s/Sauer, AAG |
| 5/7/14 | Notice and Briefing Schedule issued.<br>Copy to Atty Poliquin and AAG Sauer |
| 6/13/14 | Appearance for Carol R. Reece, filed 6/12/14. s/Neagle, Esq. |
| 6/16/14 | Brief of Petitioner in Support of Petition for Review, filed. s/Poliquin, Esq. |
| 7/17/14 | Brief of Respondent, filed 7/16/14. s/Sauer, AAG |
| 7/17/14 | Brief of Party-In-Interest Carol R. Reece Opposing Appeal of Jonathan R. Day, filed. s/Neagle, Esq. |
| 7/30/14 | Reply Brief of Petitioner Jonathan Day, filed. s/Poliquin, Esq. |
| 7/30/14 | Oral argument scheduled for 11/6/14 at 9:00.<br>Notice of Hearing sent to Atty Poliquin, AAG Sauer, and Atty Neagle |
| 11/4/14 | SPECIAL ASSIGNMENT ORDER, Humphrey, CJ (10/23/14)<br>It is ORDERED that J. Donald Marden is assigned to hear and dispose of all matters that may arise in connection with this case, including hearing the case on the merits.<br>Copy to Atty Poliquin, AAG Sauer, and Atty Neagle |
| 11/7/14 | Hearing held 11/6/14, J. Marden presiding.<br>James Poliquin, Esq.; Mary Sauer, AAG; Chris Neagle, Esq.<br>Tape 1950, Index 1777-3917<br>Under advisement. |

12/24/14     DECISION, Marden, J. (12/22/14)
The Petitioner's appeal regarding the Board's interpretation and application of Section 5(C) of its rules is SUSTAINED; the Order of the Board of Environmental Protection in the matter of Carol Reece dated March 6, 2014, DEP Order #L-25942-4H-A-N/L-25942-FS-B-N, is VACATED; REMANDED to the Board for proceedings consistent with this DECISION.
Copy to Atty Poliquin, AAG Sauer, Atty Neagle
Copy to repositories

12/24/14     Notice of removal of Record sent to AAG Sauer